[Civil No. 4477.   Filed June 1, 1942.]

[126 Pac. (2d) 308.]

E. J. SHRECK, Appellant and Cross-Appellee, v. C. C. COATES and J. M. LAFFERTY, Appellees and Cross-Appellants.

Messrs. Patterson & McFate, for Appellant and Cross-Appellee.

Messrs. Byrne & McDaniel, for Appellee and Cross-Appellant C. C. Coates.

Mr. Leo T. Stack, for Appellee and Cross-Appellant J. M. Lafferty.

ROSS, J.—This action grows out of a lease by the parties hereto of certain placer mines and mining claims located in the Walker Mining District of Yavapai County, and a right to the waters of Lynx Creek, under State Permit No. A–905, used in connection therewith, and the working and operation of said leasehold and mining properties.

Prior to January 2, 1940, appellant E. J. Shreck was the lessee of such mines and mining property and had been for some nine or ten years, the lessors being A. B. Peach, Ziba O. Brown and others, owners.

On January 2, 1940, E. J. Shreck, J. M. Lafferty and J. E. Wenger entered into a contract of lease and sale from the owners to themselves, extending over a period of ten years, with an option to the lessees to extend the contract and lease for ten more years upon the same conditions. The rental stipulated to be paid the lessors was 10% of the gold taken from the mining claims by the placer mining operations. The lease imposed the usual terms and conditions as to how the mining operations were to be conducted, such as continuous work by a minimum force, etc. It provided for the installation of equipment, of a monthly capacity of 8,000 cubic yards, capable of saving 90% of the gold in the ground worked; the payment of a minimum rental and of all taxes except on that portion of Willow Flat No. 1, a patented mining claim, situate on the east bank of Lynx Creek, planned to be conveyed by the lessors to Shreck for his home; to do all necessary annual assessment work on the unpatented claims. Many other conditions were imposed on lessees and the violation of them, or any of them, at the option of the lessors could terminate the lease. When and if the rental of 10% amounted to $60,000 the lessors agreed to convey the mining property to lessees, less the portion of the Willow Flat No. 1 reserved for Shreck's home.

January 4, 1940, the lessees, Shreck, Lafferty and Wenger entered into a partnership agreement for the operation of the leased property, the partnership business to be restricted to such operations. The following bilateral stipulations are contained in the partnership agreement:

"Second parties hereto (Lafferty and Wenger) agree and bind themselves to furnish all machinery, supplies, tools and equipment necessary to carry on good and efficient placer mining operations upon said premises, and shall pay for same, it being understood, however, that second parties are to be reimbursed for the actual costs of any such machinery, supplies, tools and equipment and when second parties are so reimbursed all parties hereto shall be equal owners of said machinery, supplies, tools and equipment;

. . . . . . . . . . . . .

"Second parties further agree to furnish all necessary capital for the purpose of carrying on any of the mining operations herein contemplated, provided however, that they shall be reimbursed from the proceeds derived from the operation of said property before any proceeds are divided among the parties hereto;

"It is mutually agreed between the parties hereto that in the event operations of said mining property are discontinued that first party (Shreck) shall have the exclusive right to buy all of the partnership machinery, supplies, tools and equipment, . . . "

The lessees operated the mines until, on May 27, 1940, Wenger sold his interest to appellee Coates, who assumed the former's obligations. This transaction of course resulted in a dissolution of the partnership between Shreck, Lafferty and Wenger, and a new partnership was entered into (May 27, 1940) among Shreck, Lafferty and Coates, in the same form as the one before. These partners operated the mining claims in the Peach-Brown lease until April 16, 1941, when, the undisputed evidence is, they ceased working

on the mines, liquidated their partnership assets and paid their obligations.

On December 13, 1940, before these parties dissolved the partnership and discontinued their mining operations, they entered into a contract with one C. S. Barnes, with the written consent of the lessors, granting said Barnes an operating right in the leased premises, for which Barnes agreed to pay them a 5% overriding royalty on all gold obtained by reason of such mining operations. Under such contract, both Barnes and lessees, independently of each other, operated the leased mines until April 16, 1941, when, as heretofore stated, lessees discontinued their operations, and since that time Barnes alone has been operating the mines and paying the overriding royalty of 5% to the Valley National Bank at Prescott, to the credit of the lessees Shreck, Lafferty and Coates, where such fund is now being held.

This litigation is over the ownership of the overriding royalties and it originated in an action by Coates against Shreck and Lafferty to dissolve the partnership. To the complaint, Shreck filed a cross-complaint alleging that the partnership had been already dissolved and its operations permanently discontinued; that by virtue of the following provision in said contract, to wit:

"13. In case the operations contemplated herein are discontinued then in such event it is mutually agreed that the mining property and lease agreement hereinbefore referred to shall become the property of E. J. Shreck without any obligation on his part to pay the second parties any consideration therefor."

cross-complainant had become and was the sole owner of the Peach-Brown lease and sale contract; and asked that his title to said instrument be quieted.

Lafferty filed an answer to Shreck's cross-complaint to quiet title, asserting that the contract with Barnes

was an assignment and not a sublease and that the overriding 5% royalty belonged to the three of them in equal parts.

Coates filed a pleading making practically the same contentions as Lafferty.

The judgment quieted the Shreck title to the Peach-Brown leasehold and divided the 5% overriding royalty equally among Shreck, Lafferty and Coates as individuals and not as partners. Shreck is dissatisfied with that part of the judgment dividing the royalty equally among them, and appeals therefrom. Lafferty and Coates are satisfied with such division but do not like the court's finding that the Peach-Brown lease is the sole property of Shreck and that they have no right or title or interest in such lease, and cross-appeal.

It is the contention of Shreck that the royalty of 5% should go to the three of them in equal parts as tenants in common until April 16, 1941, when the partnership was dissolved and discontinued operations; and it is the contention of Lafferty and Coates that they should have each his one-third of the royalty as long as Barnes pays it. It is agreed by all that such royalty is not a partnership asset. It did not accrue to them by the operation of the mines by them but solely through their common interest in the leasehold. It is also agreed the leasehold is not an asset of the partnership but that its ownership is as tenants in common. That being true, the rent or royalty would belong to them as individuals and not as partners.

This brings us to the question as to who owned the lease after the dissolution of the partnership. Whoever owned the lease, unless it is otherwise stipulated, is entitled to the royalty or rent. There is no dispute that the lease was the common property of Shreck, Lafferty and Coates until they discontinued their

operations April 16, 1941, and any rent accruing prior to that date belonged to them equally.

But the cross-appellants contend that the operating contract with Barnes was an assignment by the lessees of their lease and was not a sublease. If it was an assignment, then the judgment is correct in dividing the 5% royalty, and whether it is an assignment or a sublease depends upon the legal effect of the instrument giving Barnes the right to operate the mines. The lessees, Shreck, Lafferty and Coates, reserved to themselves the right to work the mines to the extent of 21,000 yards per month; to reenter and take possession, if Barnes should fail to keep the covenants of the principal lease or any of the covenants of his own contract. The lessees reserved a working and operating interest in the mines and a reversionary interest in case Barnes failed to keep and perform the contract as agreed. The Barnes contract was consented to by the lessors Peach and Brown as long as Barnes should perform his obligations thereunder and under the original contract of lease and sale. Barnes thereby was in privity of contract and estate with both the original lessors and sublessors. He became a lessee of the principal lessors as also of the parties hereto. In other words, he was thereafter attorning to two landlords—one actively operating the mines with him, and the other the owner of such property.

The royalties of 10% paid to the lessors were to be applied on the purchase price of the mining claims for the benefit of the lessees, who, when the purchase price was thus paid, were to become the lessors. Barnes agreed to equip the mines with machinery capable of handling 100,000 yards of material per month, instead of 8,000 as in the original lease. In a subsequent agreement the lessees bound themselves not to work more than one-half of the stream gravel upon the leased

premises laterally across the stream at any one point so long as Barnes maintained his operating agreement and contract with the first parties in good standing. And Barnes, in consideration thereof, authorized the lessees at all reasonable times to enter all the pits and workings on the property for the purpose of inspection and full information regarding his operations of the property.

Was the transaction between Barnes and the lessees (Shreck, Lafferty and Coates) an assignment of the original lease?

"An assignment of a leasehold is a transaction whereby a lessee transfers his entire interest in demised premises or a part thereof for the unexpired term of the original lease, thereby parting with all of the reversionary estate in the property, and is thus distinguishable from a sublease which contemplates the retention of a reversion by the lessee. The form of the transaction is not material, its character in law being determined by its legal effect. . . . " 32 Am. Jur. 289, sec. 313.

Not infrequently it is difficult to determine whether an instrument is an assignment or a sublease. An assignment is thought to convey all of the right, title and interest in the instrument belonging to the assignor to an assignee, who takes the place and assumes the responsibilities of the assignor. We think the distinction between these instruments is well stated, in 32 American Jurisprudence 290, section 314, as follows:

"The distinction between an assignment of a lease and the subletting of the premises lies in the quantity of interest that passes by the transfer, and not upon the extent of the premises involved. Primarily, the test is whether, by the transaction, the lessee conveys his entire term or retains a reversionary interest, however small. As a general proposition, if by the transaction the lessee conveys the entire term and thereby

parts with all reversionary interest in the property, the transaction is construed to be an assignment; but if there remains a reversionary interest in the estate conveyed, it is a sublease. To state the test in a slightly different manner, if the instrument is of such character by its terms and conditions that a reversionary interest by construction remains in the grantor of the property, he becomes the landlord and the grantee the tenant. The tenant who parts with the entire term embraced in his lease becomes an assignor of the lease, and the instrument is an assignment; but where the tenant, by the terms, conditions, or limitations in the instrument does not part with the entire term granted him by his landlord, so that there remains in him a reversionary interest, the transaction is a subletting, and not an assignment. Clearly as regards the original lessor, the criterion for determining whether a transaction in the form of a lease constitutes an assignment or a sublease is whether the entire interest in the term is transferred, without a reversion being retained by the original lessee. . . . ''

An examination of the contract between Barnes and the lessees, we think, clearly shows that the entire interest of the lessees in the original lease was not turned over to Barnes. This is very evident from the fact that the lessees retained the right to carry on operations to the amount of 21,000 yards a month. They reserved the right to reenter and take possession of the mines upon the failure of Barnes to perform the conditions of the original lease or his contract with them. They reserved some very substantial rights; for instance, the right to have the rental of 10% applied on the purchase price, the right to enter upon the workings of Barnes for the purpose of inspecting his work and keeping advised as to what he was doing and as to the condition of his operations.

This was not an assignment of part of the premises to Barnes. These mining claims covered several hundred acres and he was not given any particular acreage in which to operate, so that the rule cited

by cross-appellants, to the effect that a transfer of a tenant's entire interest in a part of the demised premises for the remainder of the term constitutes an assignment *pro tanto* rather than a sublease, has no application to the facts here.

If the partnership agreement is effective, Shreck became the owner of the Peach-Brown lease when, on April 16, 1941, the partnership discontinued operating the mines. But appellees and cross-appellants contend their stipulation to that effect (quoted above) was without any consideration and therefore void. The evidence discloses that Shreck had known the placers for at least ten years; that he was a lessee of them for that length of time just prior to the making of the lease to him, Lafferty and Coates. It is evident he knew of the possibilities of these placer mines—a knowledge Lafferty and Coates did not possess. It appears his home was, or was to be, on the property. It was agreed in their contract that when, or before, the operations were discontinued Lafferty and Coates should be compensated for all advancements for the equipment of the mines for operation; and Shreck, the home man, was given an option to buy such machinery because he was the only one who could under their agreement continue or resume the operations on the property.

The facts surrounding the transaction and the partnership recitals indicate to our minds that it was the intention of the parties that should their partnership operations cease because such operations were unprofitable, or because of lack of water, or disagreements, or dissensions, or other cause, that they should be placed as nearly as possible in *status quo ante;* that is, that Lafferty and Coates should have a return of their disbursements and Shreck left as he was before the Peach-Brown lease was entered into. We think these mutual concessions furnish sufficient considera-

tion for the agreement that the Peach-Brown lease should, upon discontinuance of operations of the partnership, become and be the property of Shreck. *Palmer* v. *Kelly,* 52 Ariz. 98, 79 Pac. (2d) 344; Id., 54 Ariz. 466, 97 Pac. (2d) 209. In this case we held that an agreement between copartners, providing that on abandonment of a mining partnership by either, the partnership property should belong to the other, was supported by a sufficient consideration, the consideration being the mutual promises of the partners on entering into the contract. In principle, the same rule should apply here.

The interest of Lafferty and Coates passed to Shreck when the partnership discontinued operations, and thereafter the 5% overriding royalty or rent was Shreck's. In *State* v. *Royal Mineral Association,* 132 Minn. 232, 156 N. W. 128, 129, Ann. Cas. 1918A, 145, the court said:

"Unaccrued rents are not personal property. They are incorporeal hereditaments. They are an incident to the reversion and follow the land. . . . They pass with a sale or devise of the land. . . . If transferred apart from the land, the provision of the statute of frauds relating to sales of land applies. . . . In fact, although separable from the reversion, they are, until such separation, part of the land. . . . 'For what is the land but the profits thereof?' . . . "

See, also, *Callahan* v. *Martin,* 3 Cal. (2d) 110, 43 Pac. (2d) 788, 794, 101 A. L. R. 871; *United States* v. *Noble,* 237 U. S. 74, 35 Sup. Ct. 532, 59 L. Ed. 844.

" . . . It is well settled that rent to accrue is an incident to, and accompanies, the reversion unless separated by an express reservation, therefore, as a general rule, upon a transfer of the reversion by the landlord, his transferee is entitled to receive all rent thereafter accruing, whether payable in money or in a share of the crop, . . . " 32 Am. Jur. 360, sec. 442.

"An assignment or transfer of the reversion carries with it the right to rent subsequently accruing, unless the rent is expressly reserved; . . . " 36 C. J. 364, sec. 1206.

"Whether the transfer or assignment of the reversion is the voluntary act of the lessor, or involuntary by act and operation of law, as in the event of a judicial sale of the reversion, such as an executor's or administrator's sale, a foreclosure sale, a partition sale, or a receiver's sale, or of a sale by the sheriff under execution at law, which is *quasi* judicial, makes no difference in the application of the principles already stated." 36 C. J. 366, sec. 1209.

The 5% royalty or rent to be paid by Barnes was not reserved after the transfer of the lease under contract and, therefore, under the rule, followed the ownership of the reversion.

The conclusion we have reached is that the 5% overriding royalty belongs to Shreck, Lafferty and Coates in equal parts of one-third each up to April 16, 1941, when the partnership was dissolved and discontinued operations; that thereafter such 5% royalty belongs to Shreck as the sole owner of the leasehold from Peach and Brown, the lessors therein. And the judgment of the lower court is hereby modified to that extent.

The cross-appellants' assignment of error is that the court was wrong in quieting title to the principal contract of lease and sale in Shreck, for the reason that the law and the evidence do not sustain such judgment. To discuss the reasons they give to sustain their position would require us to go over the same grounds we have considered in Shreck's appeal and would serve no useful purpose.

The judgment as modified is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.