688 P.2d 1075

The TANNER COMPANIES and Clinton Campbell Contractor, Inc., dba Phoenix Brick Yard, Arizona corporations, Plaintiffs/Appellees,

v.

The ARIZONA STATE LAND DEPARTMENT and The Arizona State Land Commissioner, Defendants/Appellants.

2 CA–CIV 4798.

Court of Appeals of Arizona, Division 2.

July 18, 1984.

Fennemore, Craig, von Ammon, Udall &
Powers, P.C. by Calvin H. Udall and John
Torres, Phoenix, for plaintiffs/appellees.

Robert K. Corbin, Atty. Gen. by Charleen
H. Greer, Melinda Garrahan and Rory C.H.
Abate, Phoenix, for defendants/appellants.

## OPINION

HOWARD, Judge.

This is an appeal from a judgment entered in favor of appellees after a trial de novo in an administrative appeal pursuant to former A.R.S. § 37–134 and § 37–214(D).

The record shows that Tanner Companies (Tanner) held a 20-year mineral lease on state trust land, lease No. M–908. Clinton Campbell held similar leases, M–1022, M–1456 and M–1457. The mineral compound involved in the leases was Pantano clays. The Pantano formation is a lake deposit, as distinguished from a stream deposit, of ordinary clay and clay materials. It only appears in a small area of Pima County. Pantano clays have a high alumina content and a low content of alkali salts, which make them suitable for use in the manufacture of Portland cement, face bricks, tile and other high quality fired structural products. The Pantano clays have never been used by the plaintiffs for purposes such as road or embankment construction, or in a binder with sands or gravels for borrow, fill, ballast or for similar earth work or construction purposes.

Lease M–908 was orally assigned by Tanner to Clinton Campbell Contractor, Inc. (Phoenix Brick), Tanner agreeing to renew the lease when it expired and reassign it to Phoenix Brick. Prior to the expiration of its lease, Tanner filed a renewal application with the land department, and made advance rental and royalty payments which were accepted by the department. Campbell also filed an application for the renewal of lease M–1022 prior to the time of its expiration. The renewal applications for leases M–1456 and M–1457 were not made until August 1981, after the filing of the appeal in this case. The land department agreed to wait for the outcome of this case before acting on their renewal. Lease M–908 had been scheduled to expire on July 18, 1978, but prior to the expiration of the lease, Tanner received a renewed lease M–908 for a term expiring July 18, 1998. It executed the renewed lease and submitted it to the land department, but it was never signed by the state land commissioner.

On May 17, 1979, the commissioner issued a decision and order denying Tanner's application for renewal of lease M–908 because he was of the opinion that Pantano clays were a common mineral product not subject to lease as a mineral claim.

Pursuant to Rule R–12–5–03, Arizona Compilation of Rules and Regulations (ACRR), a rehearing of the commissioner's order was held before a hearing officer who recommended that the lease be terminated.

On November 6, 1979, the commissioner adopted the hearing officer's recommendation and denied Tanner's application to renew lease M–908 and ordered Tanner's interest in the lease terminated.

The commissioner did not and had not as of the time of the trial de novo made any decision on the applications to renew the other leases.

On November 20, 1979, appellees filed a notice of appeal of the commissioner's decision not to renew lease M–908.

Because of threats by employees of the land department that the other leases would not be renewed, that the department would issue a cease and desist order as to lease M–1022 and that the state would file criminal charges against appellees and sue them for trespass, conversion and punitive damages, appellees secured a restraining order against appellants and were permitted by the trial court to file, in the appeal, a "supplemental and amended complaint" seeking a declaration that Phoenix Brick was entitled to a renewal of leases M–1022, M–1456 and M–1457. At the time the motion was filed, leases M–1456 and M–1457 had not yet expired, and lease M–1022 had expired on July 23, 1979.

After a trial without a jury, the court made findings of fact and conclusions of law finding, inter alia, that Pantano clays were subject to a mineral lease and that appellees were entitled to have the leases renewed for another 20 years. The trial court declared that appellees were entitled to have their applications to renew Mineral Leases M–908, M–1022, M–1456 and M–1457 considered and acted upon by appellants as required by law and in accordance with the trial court's findings and conclusions. It also awarded appellees attorney's fees in the sum of $85,000.

Appellants contend that (1) the trial court had no jurisdiction over leases M–1022, M–1456 and M–1457; (2) the trial court erred in construing A.R.S. § 27–235(C)(6) as allowing appellees to renew the leases for another 20 years; (3) the trial court erred in the admission and rejection of certain evidence; (4) the trial court erred in concluding that Pantano clays were not common clays; (5) the trial court erred in ordering renewal of lease M–908, since the application for renewal was not timely made and because it was improperly subleased to Phoenix Brick; and (6) the trial court erred in granting the full amount of attorney's fees.

## JURISDICTION TO DECIDE THE VALIDITY OF LEASES M–1022, M–1456 and M–1457

This case began in the superior court as an appeal from the commissioner's decision not to renew lease M–908. A.R.S. § 37–134, prior to its amendment in 1980, provided:

"A. In addition to appeals from final decisions of the commissioner to the superior court as otherwise authorized by law, an appeal from a final decision of the commissioner other than a final decision relating to the classification or appraisal of lands or improvements, made pursuant to the powers and duties conferred upon him by law, whether relating to the administration of state lands or other departments or agencies of state under his jurisdiction, may be taken by any person adversely affected by the decision to the superior court of the county in which the major portion of the land, property, or rights involved in the decision is located.

B. The appeal shall be taken by filing notice thereof in writing with the commissioner and by serving an adverse party with a copy thereof within thirty days from the date notice of the decision is mailed to the last known post office ad-dress of the appellant by the commissioner.

C. Upon service of the notice, the commissioner shall prepare a record of the entire proceedings and transmit it to the clerk of the superior court to which the appeal is taken. The clerk shall docket the appeal in the name of appellant as plaintiff and appellee as defendant and the appeal shall be at issue. The appeal shall be set for trial de novo and heard at the earliest practical time by the court without a jury. The court shall hear evidence, make independent findings of fact and conclusions of law from the evidence submitted, and shall either affirm, reverse or modify the decision of the commissioner. The decision of the superior court may be appealed to the supreme court in the manner final judgments in civil actions are appealable to that court...." [1]

Several months after the notice of appeal was filed, the trial court permitted Phoenix Brick to file an amended or supplemental complaint, an interesting procedural feat since there never was a complaint filed in the first instance but merely a notice of appeal. Phoenix Brick, without citing any pertinent authority, contends that since it could have filed an original action for declaratory judgment regarding the validity of leases M–1022, M–1456 and M–1457, there was no reason it could not, in the interest of judicial economy, merely file a supplemental complaint in the appeal and try the appeal together with the action for a declaratory judgment. The fault with this reasoning lies in an incorrect premise, that it could have secured review of the other leases by means of an action for declaratory judgment.

■ An action for declaratory relief is not appropriate to review an administrative decision when there exists a procedure to appeal from the administrative ruling. *Arizona Board of Regents v. Harper*, 108 Ariz. 223, 495 P.2d 453 (1972); *State v.*

---

1. A.R.S. § 37–134 currently provides review by the court pursuant to A.R.S. § 12–901, the Administrative Review Act.

*Superior Court of Orange County,* 12 Cal.3d 237, 115 Cal.Rptr. 497, 524 P.2d 1281 (1974); *Guilbert v. Regents of University of California,* 93 Ca.App.3d 233, 155 Cal. Rptr. 583 (1979); *Viso v. State,* 92 Ca. App.3d 15, 154 Cal.Rptr. 580 (1979); *J.R.D. Management Corporation v. New York City Conciliation and Appeals Board,* 458 N.Y.S.2d 479, 117 Misc.2d 459 (1983); *Greystone Management v. Conciliation and Appeals Board,* 462 N.Y.S.2d 13, 94 A.D.2d 614 (1983); and see, 22 Am.Jur.2d Declaratory Judgments, § 31, p. 881.

■ Furthermore, the declaratory judgment procedure may not be used to preempt or prejudge issues that are committed for initial decision to an administrative body. *Public Service Commission v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Power Authority v. Department of Environmental Conservation,* 379 F.Supp. 243 (N.D.N.Y.1974); *Schwarze v. Farm-Rite Implement Company,* 192 F.Supp. 645 (D.N.D.1960); *Dawson v. Department of Transportation,* 480 F.Supp. 351·(D.C.W.D.Okla.1979).

■ Here, the commissioner had taken no action on the renewal of lease M–1022, and the other two leases had not yet come up for renewal.[2]

The trial court clearly lacked jurisdiction to grant declaratory relief relative to these three leases and erred in granting appellees the right to file an amended or supplemental complaint.

Appellants contend that this error prejudiced the rest of the case by overemphasizing the one issue common to all the leases, in other words, whether Pantano clays were a common mineral material or a locatable mineral. We do not agree and proceed to the discussion of the other issues.

### WHAT ARE THE PANTANO CLAYS?

A.R.S. § 27–272 states:

"A. The term, 'common mineral products, materials, and property', as used in this article, includes cinders, sand, gravel and associated rock, fill-dirt, common clay, disintegrated granite, boulders and loose float rock, waste rock and materials of similar occurrence commonly used as aggregate, road material rip-rap, ballast, borrow, fill and for similar purposes.

B. Common mineral products, materials and property shall not be subject to location as a claim as provided by title 27, Chapter 2, article 3 nor to lease of such a claim as provided by title 27, Chapter 2, articles 3 and 4."

What does "common clay" mean as used in this statute? The trial court determined, as a matter of law, that the term as used in the statute was not used by the legislature as a technical term but in ordinary meaning, and, as so used, means "occurring or appearing frequently; not unusual; ordinary; undistinguished." Appellees contend that the wording of A.R.S. § 27–272(A) demonstrates that Pantano clays are not common clays since under the statute the clays are not common unless they are "... used as aggregate, road material rip-rap, ballast, borrow, fill and for similar purposes." Since they have never used the Pantano clays for this purpose, they contend it is not "common clay" within the meaning of the statute. We do not agree with this construction of the statute.

It is clear from a reading of A.R.S. § 27–272(A) that it establishes nine categories of mineral materials which are considered common mineral materials: (1) cinders, (2) sand, (3) gravel and associated rocks, (4) fill-dirt, (5) common clay, (6) disintegrated granite, (7) boulders and loose float rock, (8) waste rock, and (9) materials of similar occurrence commonly used as aggregate, road material rip-rap, ballast, borrow, fill and for similar purposes.

Appellees argue that the ninth category modifies categories one through eight by use, in other words, that in order to be a common mineral material, it must all be

---

**2.** Appellees could have forced the commissioner to act on M–1022 by requesting a hearing pursuant to Arizona Compilation of Rules and Regulations, R–12–5–01.R, or, if this failed, filed a petition in the nature of mandamus to require the commissioner to make a decision.

commonly used for those certain purposes in category nine. We do not agree. Appellees' construction of the statute renders the eight previous types of materials meaningless. Had the legislature intended such use limitation, it would have omitted the other eight types and merely stated that "materials commonly used as aggregate, road material, rip-rap, ballast, borrow, fill and for similar purposes" are common mineral products. Appellees' misconstruction of A.R.S. § 27–272(A) is evident when it is applied to another mineral listed in the statute. Appellees would have the statute read "fill-dirt ... used ... as fill." The construction of the statute as argued by appellees results in rendering the eight specific terms meaningless and redundant.

▆▆▆ A basic tenet of statutory construction is that the legislature is presumed to express its meaning in as clear a manner as possible. *Mendelsohn v. Superior Court*, 76 Ariz. 163, 261 P.2d 983 (1953); *Odle v. Shamrock Dairy of Phoenix, Inc.*, 7 Ariz.App. 515, 441 P.2d 550 (1968). Had the legislature meant to limit the common mineral materials statute to materials commonly used for aggregate, road material rip-rap, fill, etc., it could have just said that and eliminated the remainder of A.R.S. § 27–272(A). The only logical explanation of the series of terms in A.R.S. § 27–272(A) is that the legislature intended the first eight categories of minerals listed to be subject to the statutory scheme no matter the purpose for which they are used.

▆▆▆ The doctrine of the last antecedent is also applicable here. This rule of statutory construction requires that unless the context or clear meaning of the statute requires otherwise, the modifying phrase must be connected to prior words by terms such as "other", "similar", or "otherwise" in order to refer back further than the last antecedent. See *Elbert, Ltd. v. Gross*, 41 Cal.2d 322, 260 P.2d 35 (1953); *Burke v. Sullivan*, 127 Mont. 374, 265 P.2d 203 (1954). In this case it is clear that the modifying phrase "used as aggregate, ... fill and for similar purposes" is limited to its last antecedent, "materials of similar occurrence." The last antecedent doctrine was recognized by the Arizona Supreme Court in *Town of Florence v. Webb*, 40 Ariz. 60, 9 P.2d 413 (1932), but not applied since it would have rendered the rest of the statute at issue merely surplusage. The situation here is exactly the opposite. The failure to apply the doctrine will render the first eight categories in the statute a surplusage.

We conclude that the trial court erred in determining that "common clay" was to be defined with reference to the dictionary and given an "ordinary meaning." In *State Land Department v. Tucson Rock and Sand Company*, 107 Ariz. 74, 481 P.2d 867 (1971) the issue was whether sand and gravel were properly the subject of a mineral lease under A.R.S. § 27–231, et seq. In holding that they were not, the court indicated that it would construe the Arizona mining laws in conformity with the laws and policies governing public lands of the United States:

"We are satisfied that the views we have expressed here are consistent with and keep Arizona in line with the mining policy of the United States Government. Under the title 'Surface Resources', 30 U.S.C. § 601, the Secretary of the Interior by rules and regulations is directed to dispose of sand, stone and gravel and other materials such as pumice, cinders, clay and timber and forest products on the public lands of the United States. By § 602, he is directed to dispose of these materials to the highest responsible, qualified bidder, and by § 611, Congress specifically provided: 'No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders * * * shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim * * *.'

Arizona's laws as herein construed, are consistent with and conform to the laws and policies governing the public lands of the United States." 107 Ariz. at 78, 481 P.2d 867.

The legislative and case authority indicate that 30 U.S.C. § 611, an amendment to the Materials Act of 1947, was enacted to remove from the purview of the mining laws the location and removal of common varieties of sand, stone, gravel, pumice, pumicite, and cinders. After July 23, 1955, the effective date of the act, these commonly occurring materials could not be the object of location and removal under the general mining laws, but would be disposed of under the Materials Act.

In 1967 Arizona enacted its own Materials Act, and § 27–272 was enacted so that commonly occurring materials could not be the subject of location as was already the case under federal law.

■ 30 U.S.C. § 611, the federal "common varieties" statute, states:

"No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders ... shall be deemed a valuable mineral deposit within the meaning of the mining law of the United States so as to give effective validity to any mining claim hereinafter located under such mining laws.... 'Common varieties' as used in sections 601, 603 and 611 to 615 of this title does not include deposits of such materials which are valuable because the deposit has *some property giving it distinct and special value....*" (Emphasis added)

In view of *State Land Department v. Tucson Rock and Sand,* supra, and in view of the purpose of A.R.S. § 27–272, we believe the legislature intended to apply the meaning given to "common varieties" by 30 U.S.C. § 611 to the term "common clay", rather than the definition adopted by the trial court. Thus, "common clay" does not include clay which has some property which gives it distinct and special value.

The federal courts have had occasion to decide whether certain deposits must be considered "common varieties." When similar deposits have been found to exist in large quantities outside the area of the claim, they have been held to be "common varieties." See *United States v. Coleman,* 390 U.S. 599, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968) (quartzite deposits claimed to be valuable); *Melluzzo v. Morton,* 534 F.2d 860 (9th Cir.1976) (building stone).

The court in *Melluzzo v. Morton,* supra, rejected the appellee's contention that the gravel deposits possessed characteristics giving them distinct and special value, finding that the degree of superiority of the materials was not of such magnitude as to warrant the conclusion that the deposits of gravel possessed unique properties that would set them apart from common varieties. But in *McClarty v. Secretary of the Interior,* 408 F.2d 907 (9th Cir.1969), the court stated that evidence that the deposit of stone which was naturally fractured in regular shapes immediately useable in commercial and residential construction without further fabrication required the finding that it was unique.

Some courts have held that the retail price which the deposit commands on the market may be compared with the price of similar mineral deposits marketed within the same general area in order to determine whether a deposit has a distinct and special value because of some unique property. In *Brubaker v. Morton,* 500 F.2d 200 (9th Cir.1974), the court affirmed the district court's summary judgment and held that the secretary properly invalidated certain mining claims. Appellants argued that stone on their claims had a property giving it distinct and special value—and sold for a higher retail price than the normal greystone, also used for roofing. Observing that stone similar to that found in appellants' claim could be found in many other locations in the same market area for the same price as the appellants', the secretary found that when compared with colored stone in common supply, not with deposits of greystone, the appellants' stone had no distinct and special value. Noting that the secretary's interpretation not only conformed to the command of the statute and to the regulation but was also consistent with the Supreme Court's opinion in *United States v. Coleman,* supra, the court stated that the common variety of building stone on which these claims were

based was exactly what Congress had in mind when it eliminated common varieties from the coverage of the mining laws.

In *Boyle v. Morton*, 519 F.2d 551 (9th Cir.1975) the court reversed the district court's judgment and held that the record supported the secretary's finding that the red, gold and pink decomposed granite found on appellees' claims was a common variety of stone and, by the terms of § 611, it could not be the basis for a valid mining claim. Noting that the record also showed that a large quantity of colored decorative decomposed granite similar to that of the appellees was available from other claims in the same general marketing area, the court found that the secretary properly compared the price of the appellees' decomposed granite only with the price of similar decorative granite and not with the price of all decomposed granite in determining that appellees' deposits did not have a distinct and special value.

The *Brubaker* and *Boyle* cases should be compared with *McClarty v. Secretary of the Interior*, supra, where the court pointed out that the distinct and special economic value of stone may or may not be measurable by retail market price in comparison with the price of other building stone, it being quite possible that the special economic value of the stone would be reflected by reduced cost as overhead since the profit to the producer would be substantially greater while the retail market price would remain competitive with that of other building stone. The court stated that comparison of market prices could not be the exclusive way of proving that a deposit has a distinct and special value attributable to the unique property of the deposit.

The regulations of the Secretary of the Interior interpreting 30 U.S.C. § 611 are noteworthy and helpful. 43 C.F.R. § 3711.1 provides:

"(a) ... 'Common varieties' as used in this Act does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value....

(b) 'Common varieties' includes deposits which, although they may have value for use in trade, manufacture, the sciences, or in the mechanical or ornamental arts, do not possess a distinct, special economic value for such use over and above the normal uses of the general run of such deposits. Mineral materials which occur commonly shall not be deemed to be 'common varieties' if a particular deposit has distinct and special properties making it commercially valuable for use in a manufacturing, industrial, or processing operation. In the determination of commercial value, such factors may be considered as quality and quantity of the deposit, geographical location, proximity to market or point of utilization, accessibility to transportation, requirements for reasonable reserves consistent with usual industry practices to serve existing or proposed manufacturing, industrial, or processing facilities and feasible methods for mining and removal of the material...."

As can be seen from the foregoing, the mere fact that Pantano clays are found in a selectively small area does not mean they are not common clays within the meaning of the Arizona statute. If there are other similar clays in common supply which can be used as effectively as Pantano clays, then the Pantano clays have no distinct and special value. Cf. *Brubaker v. Morton*, supra.

The evidence adduced by Phoenix Brick and adopted by the trial court in its findings of fact show that unlike other clays, the Pantano clays can and had been used to make a high quality of face brick without the necessity of any additives. However, Phoenix Brick mixed it with an inferior clay from the Tolleson, Arizona area to make its clay products.

There was also other evidence showing that Pantano clays have a distinct and special value. They are the only clays that can be found in Arizona which yield a wide range of light and useful color tones, instead of the usual dull brick red. The Pantano clays make bricks 25 to 30 per

cent stronger when mixed with the Tolleson clays, than bricks made with Tolleson clay alone. There are two clay sites in California which have similar clays, but proximity to a source of clay is of extreme importance in the brick business and Phoenix Brick could not stay in business if it had to ship in clay from the California sites. Not only does the strength and color of the bricks made with Pantano clays give them a special and distinct economic value and allow the manufacture of a wide range of clay products, but they do not effloresce (develop a powdery coating) when they are wet down and then dried out. This is due to a fortuitous condition of ground water movement in the area which has made the clay free of certain soluble salts. There was also evidence that the Pantano clays were uniquely suitable for use in the manufacture of Portland cement.

The state's evidence consisted of testimony by an expert who chemically tested the Pantano clays and found them to fit the definition of "common clay" as used by ceramic experts in the Bureau of Mines.

The trial court made, inter alia, the following findings of fact:

"3. If the Pantano formation is selectively mined or winned, and if overburden and inferior clay and other soil materials are removed or segregated, mineral clays of high quality (Pantano clays) may be obtained. These clays, which consist of compounds of clay minerals, have a high alumina content and a low content of alkali salts which make them uniquely suitable for use in the manufacture of Portland cement and the manufacture of face bricks, tile and other high quality fired structural products. Among the commercially valuable Pantano clays are those with distinct chemical properties which impart various colors to fired products manufactured from them, ranging from almost white to brown, and including pink and reddish hues.

4. Pantano clays are uncommon and extraordinary in that there is no other known deposit like them in the State of Arizona. They have such distinct chemi-

cal and physical properties that they need not be used alone, but can be mixed with common clay or other inferior earthy materials to manufacture high quality face bricks, tile and other fired products. They are not of widespread occurrence and have never been used by plaintiffs for purposes such as road or embankment construction, or as a binder with sands or gravels for borrow, fill, ballast or for similar earthwork or construction purposes."

The trial court found, in its conclusions of law, that the Pantano clays were not common clay within the meaning of A.R.S. § 27–272(A) and that the four Pantano clay leases were governed by the mineral leasing law, A.R.S. § 27–231 et seq., and not the "Common Minerals Materials Leasing Act", A.R.S. §§ 27–271 through 27–275.

■■■■ The trial court's findings of fact are binding on an appellate court unless they are clearly erroneous. *Mead v. Nacey,* 23 Ariz.App. 121, 531 P.2d 166 (1975). Where a trial court's necessary findings are based on a conflict in the evidence, they will not be disturbed on appeal. *Gressley v. Patterson Tillage & Leveling, Inc.,* 119 Ariz. 154, 579 P.2d 1124 (App.1978). We cannot say that the findings of fact of the trial court were clearly erroneous. They show that the deposit of Pantano clays had a distinct and special value attributable to the unique property of the deposits. Therefore, even though the court erred in relying solely on the dictionary to define the term "common clay," its ultimate conclusions of law were correct.

RIGHT TO RENEW THE LEASE

■■■ A.R.S. § 27–233 provides that the mineral lessee shall have a preferred right to renew the lease for a term of 20 years. Appellants contend that the preference does not give appellees any superior right as against the state and that the commissioner can refuse to renew a lease if it is in the best interest of the state. We agree with this general proposition. Cf. *State v. Jones,* 94 Ariz. 334, 385 P.2d 213 (1963); *Campbell v. Muleshoe Cattle Company,*

24 Ariz. 620, 212 Pac. 381 (1923); *Ehle v. Tenney Trading Company*, 56 Ariz. 241, 107 P.2d 210 (1940). The exercise of discretion by the commissioner will control except in the case of grave abuse or illegal exercise thereof. *State v. Jones,* supra.

■ Appellants argue that the commissioner had a right to exercise his discretion not to renew lease M–908 and therefore the trial court erred in granting relief to the appellees. The difficulty with this position is that the commissioner did not refuse to renew the lease because it was in the best interest of the state. He did so because he thought the lease was for a common clay, therefore requiring that the material be put up for bid at public auction and because there was an alleged unauthorized sublease from Tanner to Phoenix Brick. Appellants cannot now assert a ground not relied upon by the commissioner.

## THE UNAUTHORIZED SUBLEASE

Lease M–908 provides that the lease is subject to regulations relating to such leases. ACRR R–12–5–705.H provides that the lease shall not be subleased without the written consent of the commissioner. Appellants contend that Tanner's oral assignment was a sublease and that since it was done without the written consent of the commissioner, the commissioner was justified in refusing renewal. We do not agree.

The trial court found in its findings of fact that Tanner and Phoenix Brick entered into an oral agreement which authorized Phoenix Brick to remove clay from Lease M–908 for 25 cents per ton while Tanner paid the State Land Department 3 cents per ton for the same material. Tanner and Phoenix Brick further agreed that at the time of the expiration of the lease in July 1978, Tanner would seek a renewal of Lease M–908 and thereafter would assign the lease to Phoenix Brick. Pursuant to the oral agreement, Phoenix Brick thereafter removed clay from Lease M–908. The trial court found, in its conclusions of law, that the oral agreement between Tanner and Phoenix Brick was not a sublease and not a present assignment of Lease M–908.

■ Appellees, citing *Shreck v. Coates,* 59 Ariz. 269, 126 P.2d 308 (1942) argue that since the entire interest in the leasehold was not transferred to Phoenix Brick, but only the right to extract material, at a certain price, from the premises, the transaction was not a sublease, or it was an assignment of the lease according to appellees and the trial court. We agree. Tanner continued to be responsible to the State Land Department. It filed all required reports, remitted to the land department the appropriate rental and paid the required royalties for each ton of clay removed from the claims. The agreement between the parties here was nothing more than a license. A license is an authority or permission to do a particular act or series of acts upon the land of another without possessing any interest or estate in such land. *Tankersley v. Low & Watson Construction Company,* 166 Cal.App.2d 815, 333 P.2d 765 (1959); *Lehman v. Williamson,* 35 Colo.App. 372, 533 P.2d 63 (1975). A license is merely a permit or privilege to do what otherwise would be unlawful, while a lease gives the right of possession of the property leased and exclusive use or occupation of it for all purposes not prohibited by its terms. *Ulan v. Vend-A-Coin, Inc.,* 27 Ariz.App. 713, 558 P.2d 741 (1976). There was no evidence here that Phoenix Brick had exclusive use or occupation of the premises for all purposes.[3]

## FAILURE TO TIMELY RENEW LEASE M–908

■ A.R.S. § 27–233(C) provides:

---

3. A profit a prendre is a right to make some use of the soil of another, such as the right to mine metals. Since Tanner was not the owner of the premises, but only had a leasehold interest, it is doubtful whether their arrangement could be considered a profit a prendre. However, if it were considered such an arrangement, then it would be closer to an easement and not a sublease. See *Costa Mesa Union School District v. Security First National Bank,* 254 Cal.App.2d 4, 62 Cal.Rptr. 113 (1967).

"Upon application to the commissioner, *not less than thirty* nor more than sixty days prior to the expiration of the lease, the lessee of mineral lands, if he is not delinquent in the payment of rental or royalty on the date of expiration of the lease, shall have a preferred right to renew the lease bearing even date with the expiration of the old lease for a term of 20 years." (Emphasis added)

Since Tanner's renewal application was filed less than 30 days before the expiration of the lease, appellants argue the commissioner was correct in not renewing the lease. We do not agree. Again, appellants are urging a ground on appeal not relied upon by the commissioner in denying the renewal. In fact, the department sent a renewal lease to Tanner for signature, but the commissioner originally refused to sign it because he was of the opinion that the deposit was common clay.

## THE ADMISSION AND REJECTION OF EVIDENCE

### A

The trial court allowed Peter Koenig, a non-disclosed witness, to testify in rebuttal as an impeachment witness. Koenig had worked for Tanner and had been in charge of the manufacturing of face brick from Pantano clays in Lease M–908. Appellants' expert witnesses testified that Pantano clays were of a marginal quality and could not be used alone to manufacture quality face brick. Koenig contradicted this testimony, testifying that he made face bricks out of Pantano clays without any additives and that such bricks were used in the construction of the new University of Arizona Library, Sabino High School and the water treatment plant at Reid Park in Tucson.

Appellants contend that the trial court erred in allowing such testimony, over their objections, since the witness had not been disclosed prior to trial and his testimony was not solely impeachment evidence, but was also offered for substantive purposes. See *Helena Chemical Company v. Coury Brothers Ranches, Inc.*, 126 Ariz. 448, 616 P.2d 908 (App.1980). We do not agree.

The *Helena Chemical* case, supra, stands for the proposition that the trial court did not err in excluding certain evidence which was not solely impeachment evidence. It does not stand for the proposition that the trial court errs if it does admit such evidence. In fact, Rule 8.5(c), Superior Court Local Rules, Pima County, provides:

"No other exhibits or witnesses shall be offered or presented during the trial other than those listed and exchanged *except* when offered for impeachment purposes or *when otherwise permitted by the Court in the interest of justice and for good cause shown.*" (Emphasis added)

The trial court is granted wide discretion under the rule governing pretrial statements and the use of witnesses not listed prior to trial. See *Packard v. Reidhead*, 22 Ariz.App. 420, 528 P.2d 171 (1974). Koenig's testimony was not solely impeachment evidence. The objection to his testimony, however, was perfunctory. It was on the ground that the witness had not been disclosed prior to trial. However, appellants did not point out to the trial court how they were going to be prejudiced by this testimony. Koenig's testimony only pertained to facts and did not constitute opinion evidence.

The trial court did not abuse its discretion in allowing this testimony.

### B

Appellants contend that the trial court erred in refusing to admit Exhibit 65, a letter written in 1961 to the president of Phoenix Brick by B.M. Burchfiel, a member of the National Institute of Ceramic Engineers and a fellow of the American Ceramic Society who had been retained by Phoenix Brick. The letter was offered to show that Phoenix Brick had known since at least 1961 that Pantano clays are basically unsuitable for the manufacture of structural clay products without the use of additives. Appellees objected to the admission of the letter on the ground, inter alia, of relevancy.

The letter contains five suggestions by Burchfiel on how he believed the Pantano clays could be successfully used. Some of the suggestions required the use of additives. One of the suggestions was to selectively mine the clays, staying away from salty areas and waste salty strata. The course adopted by Phoenix Brick was to do selective mining as suggested by Burchfiel, a method not requiring the use of additives. The letter did not, as claimed by appellants, show that Pantano clays could only be used with the addition of other materials. The trial court did not err.

### C

Testifying for appellees was E.N. Pennebaker, an economic geologist. He had been employed by Phoenix Brick to find clay deposits for the brickyard and had searched Arizona for suitable clay. He visited some 20 different area and took 80 or 90 samples which were tested by burning test bars. He was acquainted with the Pantano clays and saw the products made from them. He testified that the Pantano clays had a distinct and special economic value because the products made from them were especially strong and had a wide range of colors. He also noted that there was no other deposit like it in Arizona. He said the Pantano clays were not common clay.

Appellants moved to strike his opinion testimony on the ground that he was not a qualified expert witness under Rule 702, Arizona Rules of Evidence, he was not a clay mineralogist nor a ceramic engineer and he had no special education or experience in the area of clay mineralogy. Furthermore, he had never performed tests on clay to determine type or quality and was unfamiliar with the tests used to classify clay. Appellants contend the trial court erred in refusing to strike the testimony. We do not agree.

Whether any witness, expert or not, is competent to testify on a given subject rests in the sound discretion of the trial court, and its exercise will not be reviewed but for abuse. · *Carrel v. Lux*,

101 Ariz. 430, 420 P.2d 564 (1966). Pennebaker was an experienced geologist, and although he did not specialize in analyzing clays, he did have experience looking for them, knew how clay deposits were formed and their general mineral content, knew about the occurrences of clay in Arizona and saw the results of tests on various clays including Pantano clays. He was also acquainted with the products made from Pantano clays. The trial court did not abuse its discretion.

### THE ATTORNEY'S FEES

Appellees were entitled to attorney's fees pursuant to A.R.S. § 12–348(A)(3) which states:

"A. In addition to any costs which are awarded as prescribed by statute, a court *shall* award fees and other expenses to any party other than this [sic] state which prevails by an adjudication on the merits in any of the following:

\*　　\*　　\*　　\*　　\*　　\*

(3) A court proceeding to review an agency decision, pursuant to title 12, chapter 7, article 6, or any other statute authorizing judicial review of agency decisions." (Emphasis added)

The mandatory nature of the award under paragraph A is tempered by paragraph B which states:

"B. The court in its discretion may deny the award provided for in this section, or may reduce the award, if it finds that:

(1) During the course of the proceeding the prevailing party unduly and unreasonably protracted the final resolution of the matter; or

(2) The reason that the party other than the state has prevailed is an intervening change in the applicable law; or

(3) The prevailing party refused an offer of civil settlement which was at least as favorable to the party as the relief ultimately granted."

The trial court awarded appellees $85,000 for attorney's fees.[4]

 Appellants contend the fees should be denied or reduced because they acted in good faith to protect the trust lands and trust assets of the state and upon the advice of the attorney general of Arizona. We do not agree. Attorney's fees can only be denied or reduced pursuant to A.R.S. § 12–348(B). None of the reasons stated in the statute apply here. However, the failure of the trial court to award the fees pursuant to the correct statute requires a remand to the trial court since it failed to apply A.R.S. § 12–348(D)(2) which states:

> "The award of attorney fees may not exceed the amount which the prevailing party has paid or has agreed to pay the attorney or a maximum amount of seventy-five dollars per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee."

The trial court here paid appellees more than $75 per hour. Under the foregoing statute the trial court cannot award the prevailing party more than $75 per hour unless certain determinations are made. Whether there are factors here which justify payment of more than $75 per hour will have to be determined by the trial court.

 We note also that appellants contend the trial court erroneously awarded appellees attorney's fees for the time spent in taking a special action to the Arizona Supreme Court which was dismissed without any determination on the merits. The amounts spent or incurred for attorney's fees in this special action cannot be recovered since A.R.S. § 12–348(A)(5) allows an award of attorney's fees in such circumstances only if appellees prevail by an adjudication on the merits. Since the Supreme Court declined to accept jurisdiction, appellees did not prevail on the merits.

4. The fact that the trial court erroneously awarded the fees pursuant to A.R.S. § 12–341.01

The issue of the amount of the attorney's fees is remanded to the trial court for further consideration. The judgment of the trial court is modified by striking therefrom all references to Mineral Leases M–1022, M–1456 and M–1457; the trial court is directed to modify its findings of fact and conclusions of law, which it has incorporated into the judgment, to comply with this opinion, and the judgment, as modified, is affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.

makes no difference here.