773 P.2d 455

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado Corporation, Petitioner,**

v.

**ARIZONA CORPORATION COMMISSION and Renz D. Jennings, Marcia Weeks, and Dale H. Morgan, as members of the Arizona Corporation Commission, Respondents.**

No. CV–88–0330–SA.

Supreme Court of Arizona.

Feb. 14, 1989.

Supplemental Opinion June 1, 1989.

Lynwood J. Evans and Fennemore Craig, P.C. by Calvin H. Udall, Nancy L. Rowen, Phoenix, for petitioner.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Donald M. Peters, Shane R. Swindle, Phoenix, for intervenors/co-petitioners.

Arizona Corp. Com'n by Elizabeth A. Kushibab, Steven J. Glaser, Paul A. Bullis, Phoenix, for respondents.

FELDMAN, Vice Chief Justice.

Mountain States Telephone and Telegraph Company (Mountain Bell) brought this original special action proceeding [1] to challenge an order of the Arizona Corporation Commission (Commission). Mountain Bell, a public utility providing telephone service, and several "ScoopLine" providers (the providers) allege that the order both exceeds the Commission's power to regulate Mountain Bell's service and is an impermissible burden on protected speech. Because the issues implicate the powers of the Commission [2] and involve fundamental rights guaranteed by both the Arizona and federal constitutions, we accepted jurisdiction and stayed the Commission's order. *See* Rules 1(a) and 7(a), Ariz. R.P.Spec.Act., 17B A.R.S. [3] We have jurisdiction under Ariz. Const. art. 6, § 5(1) and Rule 1.

## FACTS

ScoopLines are an information service carried over Mountain Bell's telephone

---

**1.** In Arizona, a "special action" now provides relief that writs of prohibition, mandamus, or certiorari formerly provided. Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

**2.** Under the Arizona Constitution, the Commission is a constitutional body with broad powers over public service corporations. *See* Ariz. Const. art. 15; *see also* Comment, *The Corporation Commission: Preserving its Independence*, 20 ARIZ.ST.L.J. 241 (1988).

**3.** We hereafter cite the Rules of Procedure for Special Actions as "Rule ___."

lines. ScoopLines provide customers with access to a "dial-a-message network," enabling a customer to obtain information, messages, or entertainment by calling a provider who offers the specific message. The customer obtains the desired message by calling the appropriate provider's telephone number on the ScoopLine, a service with a "976" prefix. Typically, providers make available sports information, weather reports, commercial information (such as houses for sale, apartments to rent), prayers, and a host of other services including, inevitably, sexually explicit messages.[4] The information provider pays Mountain Bell for the 976 line to carry its messages, sets the price for the calls it receives from customers, determines the messages' content, and advertises its number. Mountain Bell then charges its customers when a call is placed from their line to a particular ScoopLine, collects the provider's charge on its regular billing to the customer, subtracts its share, and remits the proceeds to the information provider.

The number of ScoopLine providers has increased dramatically since 1985, when twenty-five providers first signed on. By November 1987, there were 156 information providers. Customers placed over four million ScoopLine calls in 1987 and incurred charges of over $13 million. Mountain Bell's share was $2 million.

This burgeoning new industry, however, has not been problem-free. The Commission received at least 618 customer complaints against ScoopLines. Over half of these complaints dealt with "dial-a-porn" operations and are irrelevant to the case before us. Other customer complaints included unexplained or unauthorized charges, Mountain Bell's imposition of charges for blocking access from a customer's line to the ScoopLine prefix, and Mountain Bell's alleged inconsistent and improper treatment of customers who had problems or complaints about ScoopLine services.

Mountain Bell, the Arizona Legislature, and the Commission all responded to these problems. Mountain Bell adopted new policies. On January 14, 1988, it agreed to create a different prefix, available only to those who subscribed in advance, for ScoopLines harmful to "Mountain Bell's reputation." Petition for Special Action at 7. This policy presumably refers to dial-a-porn services. Mountain Bell also offered free blocking[5] of ScoopLines to customers who requested it, agreed to waive charges for alleged unauthorized ScoopLine calls, and undertook to establish a centralized system for handling ScoopLine complaints.

The legislature enacted A.R.S. § 13–2920.[6] This statute requires providers to begin each ScoopLine call with a free-of-charge statement of the price and billing method. It also requires providers to pay blocking charges and allows customers a one-time bill adjustment for unauthorized calls. In addition, customers can only obtain dial-a-porn service by presubscription. The legislature also passed A.R.S. § 13–3512, which prohibits information providers from commercially offering obscene or indecent telephone communications to minors.

The Commission responded to the complaints after holding public hearings in February and March of 1988. On June 30, 1988, two months after the legislature had acted, the Commission issued its order as part of Decision No. 56039. Evidently dissatisfied with Mountain Bell's policy

---

**4.** This case does not deal with the problems from sexually explicit messages on ScoopLine service. Certain policies adopted by Mountain Bell that restrict access to "adult entertainment companies" have presumably obviated those problems. Mountain Bell made its "voluntary" decision ten days after a deputy county attorney threatened to prosecute the company for violating the Arizona obscenity law. For a history, see *Carlin Communications v. Mountain States Telephone & Telegraph,* 827 F.2d 1291 (9th Cir. 1987), *cert. denied,* ―― U.S. ――, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), which upholds Mountain Bell's policy against first amendment challenge.

**5.** Essentially, blocking enables a customer to eliminate the risk of unauthorized ScoopLine calls from his telephone (and thus ScoopLine charges on his telephone bill) by having Mountain Bell prevent access to ScoopLines from a particular telephone or line.

**6.** See Appendix A for the full text of A.R.S. § 13–2920.

changes, the Commission ordered Mountain Bell to implement universal blocking of all ScoopLines and to propose a presubscription plan for the Commission's approval. The Commission ordered compliance within forty-five days.[7]

In early July, Mountain Bell moved for rehearing and a stay of the order. The Commission denied these motions by failing to act on them. *See* A.R.S. § 40–253(A). Mountain Bell filed this special action on July 29, 1988. We granted Mountain Bell's request for a stay of the Commission's order.

Several information providers moved to intervene and join Mountain Bell as petitioners in this original proceeding. We turn first to that motion.

## INTERVENTION

■ The information providers here use Mountain Bell's ScoopLine service. Edwin A. Phillips provides weather information; John Hopkins operates two ScoopLines to provide rental home information; Pat McCullough was about to begin a Scoop-Line service providing information on used cars for sale, but the Commission's order allegedly deterred him from doing so.

Rule 2(b) expressly allows for intervention. This rule refers to Rule 24, Ariz.R. Civ.P., 16 A.R.S., which provides for intervention "when the applicant claims an interest ... and ... the disposition of the action may, as a practical matter, impair or impede [the intervenor's] ability to protect

that interest." Rule 24(a), Ariz.R.Civ.P., 16 A.R.S.[8] These providers operate Scoop-Line services, and the Commission's order regulates that service. Certainly, the Commission's presubscription requirement affects and may impair or impede the providers' businesses.

Additionally, providers have more at stake than economic interests. The Commission's order, particularly the portion requiring presubscription, affects the providers' ability to communicate with potential customers. The order is analogous to requiring a magazine or newspaper publisher to distribute to subscribers only, preventing newsstand sales or "giveaways." Thus, the Commission's order may impair the providers' fundamental rights under the federal and Arizona constitutions.

Consequently, we concluded that the applicants could intervene as petitioners.

## ISSUES PRESENTED

The parties raise an array of constitutional issues: separation of powers, free speech, freedom of contract. The separation of powers issue pertains to the relationship between the Commission and legislature. The Commission asserts that it has jurisdiction to regulate Mountain Bell, a public service corporation, either exclusively or concurrently with the legislature. *See* Ariz. Const. art. 15, §§ 3 and 6. The Commission necessarily argues, therefore, that the legislature has not preempted Decision No. 56039, either because the legisla-

7. The pertinent part of the Order of Decision No. 56039 reads as follows:
    16. The best remedy for the problems thus far experienced with Mountain Bell's provision of Scoopline service is Staff's recommended pre-subscription approach, under which, the Company will be required to universally block access to the service at no cost to the ratepayers and customers who wish to place Scoopline calls will subscribe to access by contacting the Company and requesting that their lines be unblocked.
    17. Mountain Bell should be ordered to provide Scoopline access to customers on a pre-subscription basis.
    18. Within 45 days of the effective date of this Decision, Mountain Bell should file with

the Commission a report outlining the presubscription implementation process.

8. Even if the rule did not apply to special action proceedings originally filed in an appellate court, our courts customarily apply the Rules of Civil Procedure, the Rules of Evidence, and procedural and substantive common law in special action proceedings unless the special action rules expressly prohibit the practice. Thus, no procedural impediment exists to prevent granting the motion for intervention. *See Camelback Contractors, Inc. v. Industrial Commission,* 125 Ariz. 205, 206, 608 P.2d 782, 783 (Ct.App.1980) (Industrial Commission allowed to appear on appeal even though it had not been a party in the underlying administrative proceeding).

ture cannot constitutionally do so [9] or, alternatively, because properly interpreted, A.R.S. §§ 13–2920 and –3512 do not preempt the decision.

Mountain Bell contends that the legislature has jurisdiction to regulate ScoopLine service and that the Commission's order conflicts with the statutes and is void. Mountain Bell claims, also, that the Commission's presubscription order unconstitutionally burdens its right of free speech.

In addition to adopting Mountain Bell's claims, the providers argue that the presubscription requirement interferes with their free speech rights and will actually destroy this new method of communication. They point out that people tend not to presubscribe to services such as weather information. Instead, they call such services spontaneously when and if they have a need for particular information.

Finally, Mountain Bell and the providers claim that the Commission's order unconstitutionally impairs due process rights to contract and violates Mountain Bell's right to equal protection.

Faced with numerous constitutional issues, jurisprudential considerations require us to decide the case on the narrowest grounds possible. *Cf. Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, ——, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988) ("fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"). The free speech issue enables us to decide this case by applying well established principles and without analyzing the respective roles of the Commission and the state legislature in Arizona's

system of government. Consequently, we turn to the speech issue.[10]

## FREEDOM OF SPEECH

### A. Free Speech Under the Arizona Constitution

■ The Commission argues that the order is no more than a regulation of utility service and any impact of first amendment rights is incidental and permissible. Both Mountain Bell and the providers argue that the Commission's order curbs free speech rights protected by both the first amendment to the United States Constitution and art. 2, § 6 of the Arizona Constitution. The providers specifically invoke the Arizona Constitution, arguing that "§ 6 may offer substantially more protection to free expression than does the first amendment." Because the parties explicitly invoked Arizona's constitution, we must implement whatever protection it extends. *See* Ariz. Const. art. 2, § 32 and art. 6, § 26.

The first amendment to the United States Constitution provides only a protection against government action. The words of art. 2, § 6 of the Arizona Constitution, on the other hand, directly grant every Arizonan a broad free speech right:

> Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

Ariz. Const. art. 2, § 6. Thus, the providers argue, Arizona citizens have greater free speech rights than the United States Constitution requires. *See* Leshy, *supra,* 20 ARIZ.ST.L.J., at 82.

Indeed, this court has previously given art. 2, § 6 greater scope than the first amendment. In *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d

---

**9.** The contention is that the legislature cannot interfere with the Commission's constitutional responsibility to regulate public service corporations. *See* Ariz. Const. art. 15, § 3; *see also* Leshy, *The Making of the Arizona Constitution,* 20 ARIZ.ST.L.J. 1, 88 (1988) (describing the Commission as a separate branch of Arizona government).

**10.** The parties here focused on the general free speech aspects of the Commission's order. They did not analyze this case according to the arguably lower constitutional standard for commercial speech. Under the first amendment, com-

mercial speech has a somewhat lower protection than speech involving the advocacy of ideas or political positions. *See Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810, *reh'g denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977). Presumably, the intervening ScoopLine providers engage in commercial speech. However, because the parties did not raise the commercial speech issue, and, more importantly, because the Commission's order may be an impermissible curb on non-commercial speech, we analyze this case under general free speech requirements.

594 (1966), reporters threatened with contempt for violating a trial judge's "gag" order invoked both state and federal constitutional protections. We held that a trial court could not prevent the press from publishing an account of an open court pretrial hearing. Although the order only delayed publication of the proceedings until after jury selection, we viewed the matter as one of censorship and stated that "[t]he words of the Arizona Constitution are too plain for equivocation. The right of every person to freely speak, write and publish may not be limited...." *Id.* at 259, 418 P.2d at 596. When we decided *Phoenix Newspapers,* the federal courts had not yet prohibited this type of gag order. Not until ten years later did the United States Supreme Court hold that the first amendment provided a similar, though qualified, free speech protection. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

Similarly, in *Phoenix Newspapers, Inc. v. Jennings,* 107 Ariz. 557, 490 P.2d 563 (1971), this court again turned to the Arizona Constitution. We held that art. 2, § 6 gave the public the right to attend criminal trials even though this right was not within the first amendment.[11] *Id.* at 559, 490 P.2d at 565 (noting other states that had not found the right in the first amendment or their own state constitutions). The United States Supreme Court did not recognize a similar constitutional right of access to criminal trials until *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 558–81, 100 S.Ct. 2814, 2818–30, 65 L.Ed.2d 973 (1980) (plurality opinion); *see also Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606–07, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982) (public access to trial protected by first amendment; closure permitted only where "necessitated by a compelling governmental interest, and the order is narrowly tailored to serve that interest").

Indeed, *Jennings* today may define a broader free speech right under Arizona's constitution than what the first amendment provides. In *Jennings* we reversed the trial court's order excluding the press from a preliminary hearing. *Jennings,* 107 Ariz. at 559, 561, 490 P.2d at 565, 567. Eight years later, the United States Supreme Court explicitly left open a first amendment claim of access to pretrial hearings. *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 393, 99 S.Ct. 2898, 2912, 61 L.Ed.2d 608 (1979). The Court indicated, however, that even if the first amendment applied, the public's right of access would have to be balanced with the defendant's right to a fair trial. *Id.* at 392, 99 S.Ct. at 2912. After *Richmond Newspapers'*s subsequent first amendment expansion, the Supreme Court finally recognized the public's *qualified* right to attend preliminary hearings. *Press Enterprise Co. v. Superior Court of California,* 478 U.S. 1, 10–15, 106 S.Ct. 2735, 2743, 92 L.Ed.2d 1 (1986). Arguably, however, an Arizona court can only protect the accused's right to a fair trial by continuance or change of venue. *Phoenix Newspapers, Inc. v. Winsor,* 111 Ariz. 475, 533 P.2d 72 (1975). We have not had the opportunity to squarely consider this question.

Finally, our recognition of the broad protection for speech in Arizona conforms with the Washington Supreme Court's reading of Washington Constitution art. 1, § 5, the model for Arizona's art. 2, § 6. Leshy, *supra,* 20 ARIZ.ST.L.J. at 82 and n. 501. *See, e.g., Alderwood Associates v. Washington Environmental Council,* 96 Wash. 2d 230, 241–45, 635 P.2d 108, 115–16 (1981); *see also Phoenix Newspapers,* 101 Ariz. at 259, 418 P.2d at 596 (noting Texas cases expanding free speech under similar Texas Constitution, particularly *Ex Parte McCormick,* 129 Tex.Crim. 457, 88 S.W.2d 104 (1935)).

**B. Methodology of Application**

When both the Arizona and United States Constitutions apply, the question

---

**11.** We also rested our decision on art. 2, § 11 of the Arizona Constitution, requiring the open administration of justice. *See* 107 Ariz. at 561, 490 P.2d at 567. We noted further that absent any allegation that an open hearing would result in publication of inadmissible information, no "clear, present threat to the due administration of justice" existed to justify closing the hearing to preserve a defendant's right to a fair trial. *Id.* at 560–61, 490 P.2d at 566–67.

then becomes which to apply and in what order. Our citizens adopted the Arizona Constitution by popular election. Feldman & Abney, *The Double Security of Federalism: Protecting Individual Liberty Under the Arizona Constitution*, 20 ARIZ. ST.L.J. 115, 145 n. 182 (1988). Arizona enacted its declaration of rights before the United States Supreme Court adopted the doctrine of incorporation, applying the federal Bill of Rights to the states.[12] *Id.* at 116. Thus, our framers and people must have intended the Arizona declaration of rights to be the main formulation of rights and privileges conferred on Arizonans. *See* Leshy, *supra*, 20 ARIZ.ST.L.J., at 81.

Our history, therefore, demands that we not ignore the Arizona Constitution and leaves us only to decide whether to commence our analysis with the federal or state constitution. *Phoenix Newspapers* and *Jennings* provide the answer. In both cases, the United States Constitution applied but "[a]rticle II of the Arizona Constitution [was] sufficient to resolve the litigation." *Jennings*, 107 Ariz. at 559, 490 P.2d at 565. Resolving the issues under Arizona law, we found no need to "reach the further question presented concerning the application of the First and Fourteenth Amendments of the Federal Constitution." *Phoenix Newspapers*, 101 Ariz. at 259, 418 P.2d at 596. These cases define the methodology whenever a right that the Arizona Constitution guarantees is in question: we first consult our constitution. Consequently, we apply here the broader freedom of speech clause of the Arizona Constitution.

### C. The Commission's Order Examined in Light of Arizona's Constitution

#### 1. *Government's Direct Regulation of Speech*

We focus on the parties' contentions with the broad guarantees of Ariz. Const. art. 2,

§ 6 in mind. The Commission claims that Mountain Bell, as a public utility, is subject to reasonable regulation and that its order does not significantly infringe on Mountain Bell's right of free speech. The Commission also argues that Mountain Bell lacks standing to assert the information providers' free speech rights.

■ We reject the notion that Mountain Bell may not assert the information providers' free speech rights. *See Franzi v. Superior Court*, 139 Ariz. 556, 563, 679 P.2d 1043, 1050 (1984) (recognizing standing to challenge an overbroad regulation of speech even though the challenger asserts the rights of third parties); *see also Jennings*, 107 Ariz. at 561, 490 P.2d at 567 (reporters, as members of the public, have standing to challenge a gag order). No other rule on standing would protect the free flow and distribution of information and ideas. *See Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). Thus, Mountain Bell, the medium of communication, has standing to assert the providers' free speech rights as well as its own.

■ The Commission ordered Mountain Bell to devise a presubscription plan and present it for the Commission's approval. Order No. 56039, ¶ 18, at 19. Some presubscription approaches would be less intrusive to the providers' free speech rights than others. For example, if the Commission allowed Mountain Bell to develop a universal presubscription system, so that a customer's single subscription unblocked all ScoopLines at once, the intrusion on the providers' free speech rights would be less than under a presubscription plan that required customers to separately arrange to

---

**12.** Before Arizona's declaration of rights, the United States Supreme Court had only applied the fifth amendment's taking guarantees to the states in *Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). The Court did not expand any other Bill of Rights protection to the states until *Fiske v. Kansas,* 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927) (first amendment free speech guarantee applied). Even *Chicago's* 1897 fifth amendment incorporation did not predate Arizona's declaration of rights. Our declaration came essentially verbatim from the state of Washington's constitutional convention of 1889. Feldman & Abney, *supra,* 20 ARIZ.ST.L.J., at 120–21.

unblock each individual ScoopLine.[13] The providers argue, however, that even a universal presubscription plan giving access to all ScoopLines would still burden their free speech rights because this new information industry would be less available to the public at large.

We agree with the providers. Although individualized presubscription would burden free speech the most, any requirement of prior subscription, even universal presubscription, adversely affects the right to speak and publish. We would not, for instance, look kindly on a government regulation that required all those who wish to read a newspaper or magazine to first sign a general subscribers' list before they could buy any publication at the neighborhood store. Thus, the Commission's order impinges on the rights that art. 2, § 6 of the Arizona Constitution guarantees. We believe the presubscription requirement, whether universal or individualized, affects or impairs the right to "freely speak."

█ Nor does the argument that the less serious impairment of universal subscription is justified when balanced against the Commission's responsibility to regulate public service corporations persuade us. The Arizona Constitution does not speak of major or minor impediments but guarantees the right to "freely speak." Although we may need to balance competing constitutional rights, such as the right to a fair trial and the right of free speech, we avoid, where possible, attempts to erode constitutional rights by balancing them against regulations serving governmental inter-ests. Instead, we opt for a more literal application of art. 2, § 6. *See Phoenix Newspapers* and *Jennings.* The framers of our constitution did not give our judges authority to censor speech or decide how much speech the constitution allows. *Phoenix Newspapers,* 101 Ariz. at 259, 418 P.2d at 596 ("there can be no censor appointed to whom the press must apply for prior permission to publish"). Instead, the framers gave every person the right to "freely speak, write and publish" and made judges responsible to uphold and enforce those rights.

### 2. *Time, Place, and Manner Regulation of Speech*

█ Finally, we turn to the Commission's claim that its order is an allowable time, place, and manner restriction in accordance with its constitutional responsibility to regulate public utilities. The Commission contends that the first amendment of the United States Constitution and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), allow for the time, place, and manner regulation of ScoopLines. Even if we agreed with the Commission's interpretation of the first amendment, Arizona's constitution does not permit the time, place, and manner regulation in question here.

Under the first amendment, the United States Supreme Court has articulated a three-part test for determining whether a given time, place, and manner regulation is reasonable: is the regulation content-neu-

---

13. The extent of Decision No. 56039 is unclear. Counsel for the Commission assured us at oral argument that the Commission intends some form of universal presubscription. The order itself, however, is unspecific on this point. *See* Decision No. 56039, ¶ 16, at 19. Although requiring universal blocking, the order is not clear about unblocking. It refers to the Commission staff's presubscription approach, which merely recommends that Mountain Bell report on how it intends to implement presubscription.

We note that if the Commission would approve individual unblocking it would not only infringe on the free speech rights of the Scoop-Line information providers but also those of customers. Any group or party can operate a ScoopLine, including those that advocate un-popular political ideas. ScoopLine customers may wish to expose themselves to these ideas but may not wish to have their names associated with them. Requiring individual presubscription would force customers to put their names on a subscription list, which others could review. The citizens of this state have the right to gain access to an information source without having to risk having their anonymity breached. *Cf. Fabulous Associates, Inc. v. Pennsylvania Public Utility Commission,* 693 F.Supp. 332 (E.D. Penn.1988) (federal court finding presubscription an invasion of first amendment's anonymity guarantee). In addition, individual presubscription may also raise a right to privacy question under Ariz. Const. art. 2, § 8.

tral, does it serve a significant governmental interest, and does it leave open ample alternate channels for communication. *Virginia Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830. Whether this approach implicitly requires that the government use the least restrictive alternative to achieve its purpose is unclear under federal constitutional jurisprudence. *See generally* TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–23 (2d ed. 1988); *see Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (invalidating restrictions on distribution of circulars where government could have achieved its purpose by less restrictive alternatives). On this question, we have held that any restriction on first amendment rights "must be drawn with narrow specificity." *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 371, 519 P.2d 169, 173 (1974). In *New Times*, we stated this requirement within the context of discussing whether a Board of Regents' campus newspaper policy was a reasonable time, place, and manner regulation. *Id.* As we have already determined that "narrow specificity" is a requirement of a time, place, and manner regulation under the first amendment, we must hold the same under the more stringent protections of the Arizona Constitution.

A public utility is not exempt from the Commission's regulation simply because it is in the communications business. The Commission can regulate Mountain Bell's charges for ScoopLine service to the same extent that it has the right to regulate other Mountain Bell tariffs. Also, the Commission, like any other governmental department or agency, may impose content-neutral, reasonable time, place, and manner regulations that tangentially affect speech. *E.g., New Times*, 110 Ariz. at 371, 519 P.2d at 173. However, given Arizona's constitutional protections, when dealing with regulations that affect speech, the Commission must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate. *Id.*

The record here does not satisfy us that the Commission drew its regulation with narrow specificity. No doubt the Commission can require Mountain Bell to address the ScoopLine problems even though the "problems" relate to the transmission of protected speech. We assume, *arguendo*, that the Commission could require Mountain Bell to provide its customers with a method of adjusting disputes, to give adequate service to consumers, to make allowances in the tariffs for rebate of charges for unauthorized ScoopLine calls, and to provide a clear statement of the charges against ScoopLine users. Mountain Bell's proposals for self-imposed regulations and the statute both illustrate plausible means to solve the ScoopLine problems. They also demonstrate that the Commission did not choose its regulation with narrow specificity. Although the presubscription requirement might be a more convenient and certain method of accomplishing such objectives, governmental convenience and certainty cannot prevail over constitutionally guaranteed rights. The portion of the Commission's order that requires presubscription erects a direct barrier to communication and therefore offends art. 2, § 6 of the Arizona Constitution.

## CONCLUSION

We grant the relief requested and hold that the portion of the Commission's Decision No. 56039 that requires presubscription for ScoopLine services is void and unenforceable. Because the petitioners have not requested an injunction or other specific order, we grant no other relief.

GORDON, C.J., and SARAH D. GRANT, Court of Appeals Chief Judge, concur.

Justice JAMES MOELLER did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Chief Judge SARAH D. GRANT of the Court of Appeals, Division One, was designated to sit in his stead; Justice WILLIAM A. HOLOHAN retired before the decision of this case;

Justice ROBERT J. CORCORAN did not participate in the determination of this case.

CAMERON, Justice, concurring.

I concur in the result.

## APPENDIX A

A.R.S. § 13–2920 provides as follows:

Advertisements and required preamble message for telephone information services; telecommunications corporation compensation; definitions; classification.

A. An information access telephone service provider shall not provide or sponsor an advertisement, publication or other communication regarding information access telephone service that does not clearly and conspicuously display the price for each call or for each minute of the call or provide or sponsor a television or radio advertisement that does not include a clearly audible voice announcement of the price for each call or for each minute of the call.

B. Information access telephone service providers shall begin each information access telephone service call with a clear statement, without charge, of whether the call is billed on a per minute or a per call basis and the price for the call or for each minute of the call.

C. Information access telephone service providers shall compensate any telecommunications corporation transporting the provider's service for all charges associated with blocking information access telephone services, and shall make arrangements with the telecommunications corporation for a one time adjustment per residential customer account for an information access telephone service charge if the adjustments involve calls made by minors without authorization or involve claims of fraud, theft or misrepresentation. An adjustment pursuant to this subsection, except for billing and transport charges, shall be charged to the information access telephone service provider who shall not attempt private collection of any adjustments to customers' accounts made by a telecommunications corporation.

D. An information access telephone service provider shall not provide an information access telephone service which describes or depicts, directly or indirectly, sexual conduct or activity or which contains sexually suggestive content unless access to such service is restricted to persons eighteen years of age or older and requires that the service is provided by subscription through the information access telephone service provider.

E. An information access telephone service provider shall not provide recorded announcements or live programs which forward or refer callers to telephone numbers which are not 976 service or 676 service for the purpose of the type of services provided by 976 service or 676 service.

F. In this section:

1. "Information access telephone service" means telephone service and facilities which provide access to a provider-sponsored prerecorded or live announcement or program and which is commonly referred to as "976 service" or "676 service".

2. "Provider" means a person, partnership, corporation or organization that contracts with a telecommunications corporation to transport telephone calls, bill customers or collect charges for a prerecorded or live announcement or program.

3. "Adjustment" means a waiver of all unpaid charges incurred by the residential customer for information access telephone services up to the time the customer contacts the telecommunications corporation and requests the adjustment.

G. A person who violates this section is guilty of a class 3 misdemeanor.

## SUPPLEMENTAL OPINION

FELDMAN, Vice Chief Justice.

Mountain Bell has applied for attorney's fees pursuant to A.R.S. § 12–348(A)(5), which provides as follows:

A. In addition to any costs ... a court *shall* award fees and other expenses to any party ... which prevails by an adjudication on the merits in any of the following:

\*　\*　\*　\*　\*　\*

5. A special action proceeding brought by the party to challenge an action by the state against [that] party.

(Emphasis added).

██ Mountain Bell's special action challenged the regulations imposed by the Arizona Corporation Commission under Decision No. 56039. The word "state" in A.R.S. § 12–348 includes "any agency, ... board or commission of this state." A.R.S. § 12–348(H)(3). Despite the Commission's protestations, we must acknowledge that Mountain Bell "prevail[ed] by an adjudication on the merits" when this court held that the subscription requirement portion of the Commission's order was void and unenforceable. We conclude that A.R.S. § 12–348(A)(5) applies and Mountain Bell has a right to attorney's fees.

The Commission nevertheless argues that we may exercise discretion to deny fees or reduce them significantly. If we had discretion to do so, we undoubtedly would accede to the Commission's position, for one very good reason—the dispute here is essentially one between the utilities' ratepayers and the state's taxpayers. Shifting fees will do little to ameliorate the burden of litigation except, perhaps, for the lawyers involved. Mountain Bell argues, however, that the statute gives this court no discretion regarding the fee allowance it sought.

As noted, the statute provides that the court "shall award fees." Occasions exist in the law where the word "shall" has been interpreted as something less than a mandatory requirement. *See, e.g., Arizona Downs v. Arizona Horsemen's Foundation,* 130 Ariz. 550, 554, 637 P.2d 1053, 1057 (1981) (the word "shall" is usually mandatory, but may be construed as permissive depending on the context and intent of the drafters); *State v. Sanchez,* 119 Ariz. 64, 68, 579 P.2d 568, 572 (Ct.App. 1978) (the word "shall" in a wrongful death statute means "must" or "may" depending on the context of the statute and the legislative intent), *cited in Summerfield v. Superior Court,* 144 Ariz. 467, 472, 698 P.2d 712, 717 (1985).

The legislative history of A.R.S. § 12–348(A)(5) informs our decision. The original version of HB 2229, which as modified became A.R.S. § 12–348, provided as follows:

[A] court shall award fees and other expenses to any party other than the state which prevails in any civil action ..., *unless the court finds that the position of this state was substantially justified or that special circumstances make an award unjust.*

(emphasis added). The emphasized portion of the proposed statute provided the court with discretion to deny or reduce fees where the award would be unjust. In fact, the drafters of HB 2229 based the bill on the federal Equal Access to Justice Act (28 U.S.C. § 2412), which provides that a court "may award reasonable fees." *See* Minutes of Senate Judiciary Committee, Apr. 7, 1981, at 4.

In various Senate and House committees, however, witnesses and legislators expressed concern over the "substantially justified" language in both the Senate and House versions of the bill. *See* Minutes of Senate Standing Subcommittee of Committee on Judiciary, Feb. 16, 1981, at 1 (discussing SB 1047 of 1981 and recommending it be held until it could be considered with "similar house bills," presumably HB 2229 of 1981); Minutes of House Committee on Tourism, Professions and Occupations, Feb. 23, 1981, at 3 (discussing HB 2229 of 1981); Minutes of House Judiciary Committee, Mar. 9, 1981, at 4 (discussing HB 2229 of 1981); Minutes of Senate Judiciary Committee, Apr. 7, 1981, at 5 (discussing HB 2220 of 1981). Witnesses, including Robert Robb from the Arizona Chamber of Commerce, testified in support of the Senate and House bills but also expressed "concerns" with the "substantially justified" language.

Specifically, on March 9, 1981, Mr. Robb appeared before the House Committee on the Judiciary, in support of an amendment to HB 2229 eliminating the "substantially justified" language. Mr. Robb explained "that the federal [version] would have allowed the government to escape the payment of attorney fees and that the amendment tightens up the process." Minutes of Meeting, Committee on the Judiciary, Mar. 9, 1981, at 4. It was then moved that "HB 2229 as amended do pass." The motion carried and, so far as we can tell, resulted in deletion of the discretionary language in the original proposal and the adoption of A.R.S. § 12–348 in its present form.

■ Given this legislative history, we conclude that by the use of the words "shall award fees" in § 12–348(A), instead of the phrase "may award fees" used in the federal analog, the legislature intended to make an award mandatory. Thus, the statute entitles a "party" prevailing "by an adjudication on the merits" in a proceeding challenging action by a state commission to an award of attorney's fees. The only exceptions to this rule are those set forth in § 12–348(B), which permits the court to deny or reduce awards where the prevailing party has protracted the final resolution, where an intervening change in applicable law has occurred, or where the prevailing party refused a settlement as favorable as the relief ultimately granted. None of these exceptions applies to this case.

As happens sooner or later when courts are deprived of discretion to apply common sense and principles of justice to diverse factual situations, the statute here compels a result that falls somewhat short of good sense. Nevertheless, applying the statute in accordance with specific legislative intent, we must order the taxpayers who fund the Commission to reimburse the ratepayers who pay the operating costs of their telephone utility for attorney's fees expended by the latter in fighting the former. If the legislature desires that this court have discretion to exercise common sense, it can so indicate by appropriate amendments to the statute.

■ One final issue remains. Mountain Bell requests fees significantly exceeding the statutory limit. A.R.S. § 12–348(D) provides that the fees awarded shall be based on "prevailing market rates," except that the "maximum amount of seventy-five dollars per hour" shall be allowed for attorney's fees "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee." A.R.S. § 12–348(D)(2). Although counsel for Mountain Bell are certainly qualified attorneys, we have no doubt that many other law firms would also consider themselves qualified to represent Mountain Bell on the general free speech issues involved in this case. Given our disinclination to award any fees, we are not disposed to exercise what little discretion we have by exceeding the hourly maximum set by statute. *See Tanner Companies v. Arizona State Land Department*, 142 Ariz. 183, 196, 688 P.2d 1075, 1088 (Ct.App.1984). We therefore limit the allowance to $75 per hour, even though we note that the market rate for services such as those provided here exceeds that amount.

The application is granted. Costs are allowed as claimed. Fees will be allowed in accordance with this opinion.

GORDON, C.J., CAMERON, J., and GRANT, Court of Appeals Chief Judge, concur.

Justice James Moeller did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Chief Judge Sarah D. Grant of the Court of Appeals, Division One, was designated to sit in his stead; Justice William A. Holohan retired before the decision of this case; Justice Robert J. Corcoran did not participate in the determination of case.