133 P.3d 756

**Edward SALIB, Plaintiff/Appellant,**

v.

**CITY OF MESA, Defendant/Appellee.**

**No. 1 CA–CV 04–0436.**

Court of Appeals of Arizona,
Division 1, Department C.

May 3, 2006.

As Corrected May 5, 2006.

---

Jorden Bischoff McGuire Rose & Hiser PLC By Court Rich, Scottsdale, and Institute for Justice, Arizona Chapter By Timothy D. Keller, Phoenix, Attorneys for Appellant.

City of Mesa By Julie M. Kriegh, Assistant City Attorney, Mesa, Attorneys for Appellee.

## OPINION

IRVINE, Presiding Judge.

¶ 1 Edward Salib ("Salib") appeals from the denial of his claim that the City of Mesa violates his right to free speech under the Arizona and United States Constitutions by limiting how much of his donut business's windows can be covered by advertising signs. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶ 2 Salib owns a Winchell's Donut House franchise within a designated redevelopment area of Mesa. To attract customers, Salib displays signs affixed to his store windows that advertise his products. On August 5, 2002, after giving Salib several warnings, a Mesa code enforcement officer ordered Salib to remove his window signs because their display violated Mesa's Sign Code, ch. 19 (2001) (the "Sign Code"), which Mesa had enacted the prior November. Specifically, the officer contended that Salib's display violated Sign Code 11–19–6, which prohibited businesses from covering more than 30% of their windows with signs.[1] The parties disagree whether Salib was forced to remove the signs that day. In any event, the matter apparently ended there as Mesa did not cite Salib for the violation.

¶ 3 On January 8, 2003, Salib filed a complaint against Mesa alleging the Sign Code violates his free speech rights under the Arizona and United States Constitutions. He asked the court to declare the Sign Code unconstitutional and enjoin Mesa from enforcing it. After engaging in discovery, the parties filed cross-motions for summary judgment. The trial court granted summary judgment in favor of Mesa, stating that "[t]he ordinance ... satisfies the Arizona and U.S.

---

1. Sign Code 11–19–6(E)(3) regulates window signs in the redevelopment area and provides as follows: "(a) Maximum of 30% of window coverage is allowed. 70% of the window must be able to be seen through. (b) Window signs are only allowed on the ground floor of the building." The Sign Code defines "window signs" as "[a]ny device conveying either commercial or noncommercial messages or both commercial or noncommercial messages for visual communication that is used for the purpose of bringing the subject thereof to the attention of the public; but not including any lawful display of merchandise" and that are "placed on, affixed to, painted on or located within the casement or sill area of a mineral glass window." Sign Code 11–19–6(GG),(TT).

In March, 2003, the Sign Code was amended to define "window" to include a series of neighboring windows not separated by more than six inches. The effect of the amendment was to allow larger signs because the 30% would be measured against a larger area.

Constitution[s]." This timely appeal followed.

## DISCUSSION

■ ¶ 4 Salib argues the trial court erred by ruling in favor of Mesa because the Sign Code violates his rights to engage in free speech as guaranteed by both the First Amendment of the United States Constitution and Article 2, Section 6 of the Arizona Constitution. We review de novo the grant of summary judgment, viewing the evidence in the light most favorable to the non-prevailing party. *Romley v. Arpaio*, 202 Ariz. 47, 51, ¶ 12, 40 P.3d 831, 835 (App.2002). The trial court correctly entered summary judgment if there is "no genuine issue as to any material fact and ... [the City] is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(c). Likewise, we review de novo whether the Sign Code passes constitutional muster. *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 110, ¶ 11, 60 P.3d 246, 250 (App.2002).

¶ 5 Salib raises issues under both the Arizona and United States Constitutions. As will become apparent, our analysis of the two constitutions overlaps in many respects. Nevertheless, because the standards are not identical, we discuss them separately.

## I. The First Amendment to the United States Constitution

■ ¶ 6 The protections provided by the First Amendment must be considered in the context of the particular form of expression at issue. As the United States Supreme Court has recognized, "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 97, 69 S.Ct. 448, 93 L.Ed. 513 (1949)). With regard to govern-

ment regulations of signs, the Supreme Court has explained:

> While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise.

*City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). Even within the narrow context of sign regulation, the First Amendment may apply differently depending upon whether signs are residential, commercial or non-commercial, off-site or on-premise, content or viewpoint neutral, or near highways and roadways. *See generally* Daniel R. Mandlker, *Free Speech Issues in Sign Regulation*, Land Use Institute, SH018 A.L.I.-A.B.A. 159 (Aug. 22–24, 2002). Consequently, any precedent in this area must be relied upon with caution and with careful regard to its particular context.

■ ¶ 7 As recognized by the Supreme Court in *City of Ladue*, signs are generally subject to time, place and manner restrictions.[2] The Supreme Court has also recognized, however, that there is a distinction between commercial and noncommercial speech. *See generally Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Because of this distinction, a restriction on a sign expressing a purely commercial message is subject to a separate test under the First Amendment, although one that overlaps in many respects with the time, place and manner test applicable to all signs. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554, 121 S.Ct. 2404, 150 L.Ed.2d 532

---

**2.** Time, place and manner restrictions "are valid provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored [3] to serve a significant governmental interest, and [4] that they leave open ample alternative channels for

communication of the information." *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 818 (6th Cir.2005) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

(2001) (noting that the "framework for analyzing regulations of commercial speech [ ] is 'substantially similar' to the test for time, place, and manner restrictions").

■ ¶ 8 If a sign regulation burdens both commercial and noncommercial speech it may be necessary to analyze it under the standards applicable to each. *See e.g., Outdoor Sys., Inc. v. City of Mesa,* 997 F.2d 604 (9th Cir.1993) (applying both the *Central Hudson* test and the time, place and manner test). In this case, both parties agree that the signs at issue involve only commercial speech, so we confine our First Amendment analysis to that standard, although we will address the elements of the time, place and manner test in more detail in our discussion of the Arizona Constitution.

■ ¶ 9 Under *Central Hudson,* commercial speech that concerns unlawful activity or is misleading is not protected by the First Amendment. *Central Hudson,* 447 U.S. at 563–64, 100 S.Ct. 2343. Commercial speech that falls into neither of these categories may be regulated if the government satisfies a three-prong test. *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618, 624, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). First, the government must assert a substantial interest in support of the regulation. *Id.* Second, the government must demonstrate that the restriction on commercial speech directly and materially advances that regulation. *Id.* Third, the regulation must be narrowly drawn. *Id.* Mesa does not argue that Salib's signs are misleading or concern unlawful activity, so the Sign Code must meet the three-part test. Mesa argues, and Salib concedes, that the governmental regulation of aesthetics constitutes a substantial interest, so the first prong of *Central Hudson* is not at issue.[3]

■ ¶ 10 Under the second prong of *Central Hudson,* the government "must demonstrate that the challenged regulation advances [its] interest in a direct and material way." *Id.* at 625, 115 S.Ct. 2371 (quotations

omitted). This burden is "not satisfied by mere speculation or conjecture; rather, [the government] ... must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 626, 115 S.Ct. 2371 (quotations omitted). Nevertheless, the Supreme Court does not "require that empirical data come to [the courts] accompanied by a surfeit of background information" and has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even ... based solely on history, consensus, and 'simple common sense.'" *Id.* at 628, 115 S.Ct. 2371 (citations omitted).

¶ 11 Salib argues that this prong has not been met because the Code "is arbitrary and incapable of actually furthering a significant governmental purpose." Salib asserts that no studies were conducted to determine what aesthetic or safety problems existed and how the Sign Code could solve such problems, so the Sign Code has not been proven to advance governmental interests.

¶ 12 Mesa responds that the Sign Code was enacted because of legitimate concerns among business owners that many businesses in the area had 100% coverage of their storefront windows and that this total coverage was unattractive and detracted from the aesthetics of the city. Mesa further argues that because the Sign Code clearly listed statements of purpose and intent, the Sign Code directly advances substantial governmental interests. It also argues that the city council researched the effects of the Sign Code on aesthetics, although copies of the research were not kept. The record does contain a 1999 Council Report from the City Manager to the City Council listing aesthetics as a reason for the limit on window coverage to 30%. The same report noted the "primary task of [amending the Sign Code] is to provide an encouraging environment for investment in the redevelopment area."

---

3. Mesa also asserts safety as a goal, stating that it will be easier for police to see through windows that are not totally blocked. Salib responds that seeing through windows is not a valid concern because businesses are not required to have any

windows and are free to cover windows entirely with blinds or shades. Because Mesa's interest in aesthetics is sufficient to support the Sign Code, we do not address safety as an independent justification.

¶ 13 To update the Sign Ordinance Mesa created a Project Team, which included business owners and City staff. After receiving recommendations from the Project Team, city staff held public meetings seeking input regarding the suggested changes, including the suggestion to limit window coverage to 30%. The proposed amendments were then reviewed and approved by the Downtown Development Committee and approved by the city council.

¶ 14 A regulation not containing a statement of purpose may lack evidence of direct advancement of a substantial governmental purpose. *See, e.g., Desert Outdoor Adver. Inc. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir.1996); *Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551, 555–56 (2d Cir.1990). Here, the Sign Code is accompanied by clear statements of purpose and intent that address aesthetic concerns. The Sign Code states, in part:

(A) The purpose of this Sign Ordinance regulating signs of all types is to:

1. Preserve and protect the public health, safety and welfare within the City of Mesa.

. . . .

(B) The intent of the application of this Ordinance is to:

. . . .

3. Provide an improved visual environment for the citizens of and visitors to the City of Mesa, Arizona.

Sign Code 11–19–1. *See, e.g., Get Outdoors II, L.L.C. v. City of San Diego*, 381 F.Supp.2d 1250, 1266 (S.D.Cal.2005) (holding that a statement of purpose accompanying a regulation which clearly states that the regulation's purpose was aesthetics is sufficient to show that the regulation directly advances the governmental interest). Mesa's city council plainly concluded that regulating signs directly furthered its interest in promoting aesthetics. This determination is entitled to reasonable deference. *Prime Media*, 398 F.3d at 823.

¶ 15 As for proof, the First Amendment does not require a formal study before a regulation may be enacted. The record shows that the city council received consider-able input on the subject of window coverage and aesthetics before enacting the Sign Code. Although its final adoption of the Sign Code may have rested on anecdote, history, consensus or simple common sense, *see Went For It*, 515 U.S. at 628, 115 S.Ct. 2371, rather than a formal study or survey addressed specifically to the window coverage provision, the constitution requires no greater proof. Therefore, Mesa has shown that the Sign Code was enacted to, and does in fact, directly advance the substantial government interests of aesthetics.

¶ 16 Next, Salib argues the restriction is not narrow enough and therefore violates the third prong of *Central Hudson. Id.* at 632, 115 S.Ct. 2371. It is clear from the First Amendment cases that narrowly tailored or narrowly drawn does not mean that the least restrictive means must be used. *Id.* Rather, a "reasonable fit" between the intent and purpose of the regulation and the means chosen to accomplish those goals is required. *Id.* The regulation does not have to be perfect, but its scope must be in proportion to the interest served. That is, the regulation must not go beyond what is necessary to achieve the desired objective. *Id.* Finally, while not dispositive, the existence of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the 'fit' . . . is reasonable." *Id.*

¶ 17 Salib argues that the regulation is not a reasonable fit to the desired goals of improved aesthetics because Mesa never explained how the 30% blockage figure was reached or why the regulation was drafted to only affect signs within the window sill and not outside the sill area. He also argues that Mesa's Senior Redevelopment Specialist, Patrick Murphy, admitted during a deposition that a less restrictive Sign Code would have been equally effective.

¶ 18 We read Mr. Murphy's testimony differently. While Mr. Murphy did state that any reduction from allowing 100% window coverage would be an improvement over no restriction at all, he did not state that all reductions would have an equal effect on

aesthetics. In fact, he stated in his deposition that a reduction to 45% would be less aesthetically effective than a reduction to 30%.

¶ 19 As noted above, there were concerns among business owners that many businesses in the area had 100% coverage. The Sign Code was adopted to address this problem, and Mesa argues that 30% is a reasonable compromise between 100% coverage and a total ban of signage. Further, Mesa argues, the Sign Code is narrow because it only addresses signs that are inside the pane, and the Code allows alternative methods of communication, including signs hanging outside of the window sill area. Additionally, Mesa conducted comparisons with other communities and found that the 30% restriction on window coverage was comparable to other cities' restrictions.[4]

¶ 20 We agree with Mesa that its explanation for the scope of the window coverage restriction satisfies the First Amendment. As discussed in a recent Sixth Circuit decision, exact justifications for what are essentially subjective judgments are not required.

> To ask the City to justify a size restriction of 120 square feet over, say 200 square feet or 300 square feet would impose great costs on local governments and at any rate would do little to improve our ability to review the law—because any further explanation assuredly would contain the kind of aesthetic and subjective judgment that judges are not well-equipped to second guess. Better, in our view, to save such demanding review for situations where the regulation is not content-neutral, where it does not leave ample alternative channels for communication because it is (or nearly is) a complete ban, or where the "broad sweep of the regulations" themselves show that the government did not reasonably weigh the costs and benefits of regulating speech.

*Prime Media*, 398 F.3d at 823–24.

¶ 21 For similar reasons, we are not in a position to determine what percentage of window coverage is optimal. Rather, we only decide if the 30% figure that was adopted by the Sign Code is a reasonable fit to further the goal of improving aesthetics. We conclude that it is. Signs are not completely banned, but the windows will largely remain uncovered. Reasonable minds can differ as to whether Mesa's interest would best be served by a 15%, 25%, 30% or 40% limitation on window coverage, but under the facts of this case we cannot conclude that these differences of degree are of a constitutional dimension. The exact balance between the size of the signs and the aesthetic benefits attained is ultimately a subjective decision best left to the city council to determine through its decision-making processes.

¶ 22 We also disagree with Salib's argument that because Mesa never justified why the Sign Code does not address signs outside the window area, the Sign Code is not a reasonable fit to the goal of aesthetics. The First Amendment does not "impose upon [regulators] the burden of demonstrating that ... the manner of restriction is absolutely the least severe that will achieve the desired end" but simply a reasonable fit. *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). "Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.*

¶ 23 We conclude the Sign Code directly advances a substantial governmental interest and is narrowly tailored to directly advance the goal of improved aesthetics. Therefore, it meets the *Central Hudson* test for regulation of commercial speech and is constitutional under the First Amendment.

## II. The Arizona Constitution

¶ 24 Article 2, Section 6 of the Arizona Constitution provides: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." This provision has been described as broader than the First Amendment right to free speech. *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 358, 773 P.2d 455, 463 (1989). The

---

**4.** Mesa states that Chandler, Gilbert, Peoria, Scottsdale and Tempe allow a maximum of 25% coverage, Glendale allows 50%, and Phoenix allows 20%.

scope of the difference, however, has never been defined and we have recognized that the Arizona Constitution does not provide greater protection of speech in every circumstance. *Martin v. Reinstein*, 195 Ariz. 293, 321, 987 P.2d 779, 807 (App.1999). It is undisputed that both constitutions allow for reasonable time, place and manner restrictions that affect speech. *Mountain States*, 160 Ariz. at 357–58, 773 P.2d at 462–63.

¶ 25 Salib begins his argument by asserting that the Arizona Constitution, unlike the federal constitution, makes no distinction between commercial and non-commercial speech. This issue has not yet been decided by our courts. *See Outdoor Sys., Inc.*, 997 F.2d at 614 ("The Arizona courts have yet to determine whether their state constitution's free speech provision allows a distinction between commercial and noncommercial speech."); *State ex rel. Corbin v. Tolleson*, 160 Ariz. 385, 389 n. 3, 773 P.2d 490, 494 (App.1989).

¶ 26 A case may arise that will require a ruling on this issue, but this is not that case. As noted above, in the context of regulating signs there may be no meaningful distinction between commercial and noncommercial under the First Amendment because the commercial speech test and the time, place and manner test are essentially the same. *See Lorillard*, 533 U.S. at 554, 121 S.Ct. 2404 (noting the similarities between the applicable constitutional standards). Therefore, because the issue before us involves only signs, it is unnecessary for us to decide whether the Arizona Constitution could ever recognize a distinction between commercial and noncommercial speech in other contexts.

¶ 27 Salib also argues that the Sign Code is not a valid time, place and manner restriction under the Arizona Constitution. In *Mountain States*, our supreme court stated that the government may impose reasonable restrictions that incidentally burden speech if they (1) are content neutral, (2) serve a significant governmental interest, (3) leave open ample alternative channels for communication of the information, and (4) are drawn "with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Mountain States*,

160 Ariz. at 357–58, 773 P.2d at 462–63. On its face, this is essentially the same test as the time, place and manner test applicable under the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Therefore, our analysis of the First Amendment also resolves many of the issues under the Arizona test. In particular, Salib concedes that the Sign Code is content neutral, and we have found that improving aesthetics is a substantial government interest and Mesa's Sign Code directly serves that interest.

■ ¶ 28 As for the ample alternative means portion of the test, Salib offered no argument in his brief that the Sign Code failed to leave open ample alternative communication channels. Even if he had argued it, Mesa convincingly argues that ample alternative channels exist because the Sign Code restricts only those signs that are within the window sill, thus permitting advertising signs outside of the window sill. Further, Mesa argues, Salib may request a comprehensive sign plan which would allow signs that are not otherwise permitted. We also note that the Sign Code does not completely ban signs within windows, it merely limits the percentage of a window the sign may occupy. This is particularly important to our analysis, because communication with potential customers through window signs remains an available option, albeit in regulated form. *See Ward*, 491 U.S. at 802, 109 S.Ct. 2746 ("[T]he guideline continues to permit expressive activity in the bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification."). Under these circumstances, we conclude that ample alternative channels exist.

■ ¶ 29 This leaves Salib's main argument under the Arizona Constitution, which is that the restriction is not drawn with narrow specificity to affect as little speech as possible. Salib admits that "[a]bsent this requirement, the Arizona test would be no more stringent that the U.S. Supreme Court's time, place and manner analysis," but argues that "the Arizona Supreme Court clearly intended to articulate a more rigorous test."

¶ 30 The only case Salib cites to support his argument that the Arizona and federal tests are different is *Mountain States.* In that case, the court applied the First Amendment time, place and manner analysis, and also held that the same analysis exists "under the more stringent protections of the Arizona Constitution." *Mountain States,* 160 Ariz. at 358, 773 P.2d at 463. The court went on to state that restrictions that affect speech "must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Id.* Applying this standard, the court found that the presubscription requirement at issue there "erect[ed] a direct barrier to communication and therefore offends art. 2, § 6 of the Arizona Constitution." *Id.*

¶ 31 Salib argues *Mountain States* shows that the Arizona "narrow specificity" requirement is stricter than the federal "narrowly tailored" requirement. The Ninth Circuit found no such distinction when it applied the Arizona Constitution to a sign ordinance. *See Outdoor Sys.,* 997 F.2d at 614 ("Arizona's requirement that time, place, and manner restrictions be drawn with 'narrow specificity' appears identical to the requirement under federal law that such restrictions be narrowly tailored."). In contrast, a case from Division Two of this court came to a different conclusion in a non-sign context.

¶ 32 *Empress Adult Video & Bookstore v. City of Tucson,* 204 Ariz. 50, 57, ¶ 13, 59 P.3d 814, 821 (App.2002), interpreted *Mountain States* as "adopt[ing] a different and more restrictive standard for regulations affecting speech than the federal standard enunciated in *Ward.*" In particular, *Empress* relied on the statement in *Mountain States* that a restriction must "regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Id.* (quoting *Mountain States,* 160 Ariz. at 358, 773 P.2d at 463) (emphasis omitted). In *Empress,* the court found that closing-hours requirements for adult businesses were not the least restrictive means to curb the negative effects of adult speech. "Rather, the requirement bans such speech for not less than seven hours a day and, thus, during those hours, 'erects a direct barrier to

communication.' " *Id.* at 60, ¶ 21, 59 P.3d at 824.

¶ 33 The court in *Empress* concluded that a restriction may pass muster under the Arizona Constitution only if it is narrowly tailored to a greater degree than required under the United States Constitution. Even assuming this conclusion is correct, an issue we need not decide here, Salib has not established that the increased strictness applies to the regulation at issue here. Unlike the restrictions struck down in *Mountain States* and *Empress,* limiting how much of a window may be covered by signs does not erect a direct barrier to communication. Signs are allowed at any time and in any window. The only limitation is that no more than 30% of the window or group of windows can be covered. In *Empress,* certain adult speech was banned for not less than seven hours a day. *Id.* In *Mountain States,* customers could only call ScoopLines for information if they presubscribed. 160 Ariz. at 352, 773 P.2d at 457. In both cases communication was actually prevented from occurring.

¶ 34 Moreover, in each case the court found no evidence that the regulation was the least restrictive means to accomplish the regulatory goal, which was often only indirectly related to the subject of the restriction. For example, in *Empress* the primary purpose of the closing-hours requirement was to regulate the negative secondary effects of adult businesses, which "included 'increased crime and sexually oriented litter' as well as 'the negative effect on neighboring property values.' " 204 Ariz. at 59, ¶ 18, 59 P.3d at 823. The closing-hours requirement furthered these goals by limiting the time patrons were present, but the court found less restrictive means, such as increased law enforcement, had not been considered. *Id.*

¶ 35 Sign regulations are different. Mesa has determined that regulating window coverage by signs promotes important aesthetic interests. The size of the signs in relation to the size of the windows is directly tied to the aesthetic goal of the regulation. Less coverage means less clutter; more coverage means more. Thus, in the context of regulating window coverage there will always be a direct and proportionate relationship be-

tween the regulation and the desired goal. As the United State Supreme Court has explained:

> Here, the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself.... [T]herefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose.

*Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 810, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

¶ 36 We believe this conclusion applies equally to our analysis under the Arizona Constitution. The narrowly tailored requirement addresses whether there is a reasonable fit. The Arizona Constitution may require a tighter fit in some contexts, but for limits on window coverage the fit is already close and direct—the more restrictive the regulation, the more the aesthetic benefit. Salib may disagree with Mesa as to whether the aesthetic benefits justify the restrictions, but as with many measures related to aesthetics, the wisdom of such restrictions are not a constitutional question appropriate for a court to decide.

¶ 37 Therefore, we conclude that Mesa's limitation on the size of signs does not violate the Arizona Constitution.

## CONCLUSION

¶ 38 For the reasons stated above, we conclude that the Sign Code is valid. We therefore affirm the trial court's granting of Mesa's Motion for Summary Judgment.

CONCURRING: MAURICE PORTLEY and PATRICIA K. NORRIS, Judges.