150 P.3d 1258

Jane DOE, individually and on behalf of all others similarly situated, Plaintiffs/Appellees,

v.

Joseph ARPAIO, Maricopa County Sheriff, in his official capacity; Maricopa County, Defendants/Appellants.

No. 1 CA–CV 05–0835.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 23, 2007.

American Civil Liberties Union Foundation, By Brigitte A. Amiri, Jennifer McAllister–Nevins, Susan Talcott Camp, Charu Chandrasekhar, New York, NY, Lewis and Roca LLP, By Susan M. Freeman, Sonya K. Parrish–Boun, Phoenix, Co-counsel for Plaintiffs/Appellees.

Burch & Cracchiolo PA, By Daryl Manhart, Stasy D. Knight–Click, Phoenix, Counsel for Defendants/Appellants.

## OPINION

IRVINE, Presiding Judge.

¶ 1 It is well-established law that certain constitutional rights of prison inmates may be curtailed to satisfy legitimate penological interests. This case involves an inmate [1] who asked to be transported to a location outside the jail so she could obtain a first-trimester abortion at her own expense. She was also willing to pay any security and transportation costs. Maricopa County and Joseph Arpaio, in his official capacity as the Maricopa County Sheriff (collectively "the County"), had no objection to the request, but required her to first obtain a court order directing the transportation. The central issue before us is whether requiring a court order to transport an inmate to receive an abortion serves a legitimate penological interest. We hold that it does not, and affirm the judgment of the superior court.

## BACKGROUND

¶ 2 The County operates several jail facilities in Maricopa County that house pre-trial detainees and sentenced inmates who are not transferred to the Arizona Department of Corrections. Correctional Health Services ("CHS"), an agency of the County, provides medical care to the inmates in the jail facilities, and also in a secure ward of the county hospital. When an inmate requires medical services beyond the capability of the on-site CHS personnel, CHS arranges for the County to transport the inmate to an off-site medical facility.

¶ 3 CHS only performs, and only seeks transportation for, procedures CHS deems medically necessary. Accordingly, CHS provides pre-natal care and delivery services to pregnant inmates, but does not provide non-therapeutic abortion services.

¶ 4 The County has an unwritten policy that prohibits transportation of inmates off-

---

**1.** The trial court allowed plaintiff Jane Doe to proceed pseudonymously. We continue that us- age.

site for elective medical procedures (the "Policy"). As a result of the Policy, an inmate may only obtain a non-therapeutic abortion by securing a court order directing the County to transport her off-site for the procedure.[2] The County requires the inmate to make her own financial arrangements for the procedure and to pay the cost of security and transportation.

¶5 Doe discovered she was pregnant shortly before the County took her into custody on March 18, 2004 after she was sentenced to four months in the County jail.[3] CHS personnel confirmed Doe's pregnancy by medical examination during her first week of incarceration. She immediately and repeatedly informed CHS medical personnel that she desired to terminate the pregnancy. Consistent with the Policy, the County refused to transport Doe for an abortion procedure.

¶6 For reasons mostly beyond her control, it took Doe seven weeks to obtain a court order. The superior court commissioner who sentenced Doe denied Doe's initial request for a court order directing the County to transport Doe for the procedure, stating, "I have been told that this Court and this County does not involve itself usually in transporting or assisting inmates in having elective medical procedures performed." Doe eventually, on May 12, 2004, obtained an order from the superior court that required the County to transport her to have the abortion procedure.

¶7 In conjunction with her request for an order, Doe filed a complaint seeking a declaratory judgment that the Policy was unconstitutional and alleging claims under 42 United States Code section 1983 (1996) for violation of plaintiffs' rights to privacy under the Fourteenth Amendment of the United States Constitution and violation of plaintiffs' rights to adequate medical care under the Eighth Amendment of the United States Constitution.[4] Doe also sought a permanent injunction enjoining the County from enforcing the Policy insofar as it would deny plaintiffs access to safe, timely and legal abortions.

¶8 The parties cross-moved for summary judgment. The superior court granted Doe's motion for summary judgment and denied the County's motion, ruling that the Policy was unconstitutional because it constituted an "undue burden" on a woman's right to choose to have an abortion and because it found the Policy served no legitimate penological purpose.

¶9 The superior court entered judgment in favor of Doe and permanently enjoined the County from enforcing the Policy insofar as it applies to an inmate seeking an abortion. The County timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## DISCUSSION

¶10 A court may grant summary judgment when "there is no genuine issue as to any

---

**2.** The County attempts to recast the Policy as one that permits transportation for abortion services if the inmate obtains a court order. This is a misleading characterization, however, as the County must comply with a court order directing it to transport an inmate or risk being held in contempt of court. *See Holt v. Hotham,* 197 Ariz. 614, 616, ¶11, 5 P.3d 948, 950 (App.2000)(stating civil contempt arises when a party refuses to perform an act he is lawfully ordered to perform; the power to punish contempt is inherent in the trial court). The County does not adequately accommodate the exercise of an inmate's constitutional rights by simply recognizing that the courts are available to enforce those rights.

**3.** Doe asked the prosecutor to delay the sentencing, but the prosecutor refused, telling her that

she could obtain an abortion while on work furlough release. Although Doe was eligible for work furlough, when jail personnel learned she was pregnant, they transferred her to a dorm in the jail from which she could not participate in work furlough. In this dorm, her access to telephones was limited.

**4.** Doe brought her complaint on behalf of all those similarly situated. The trial court ruled that given the limited duration of a woman's pregnancy and the limited duration of County jail sentences, the mootness doctrine did not prevent the court from addressing Doe's cause of action on the merits.

material fact and [ ] the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). We view the evidence in the light most favorable to the County, against which judgment was entered, and determine de novo whether there are genuine issues of material fact and whether the trial court erred in its application of the law. *Salib v. City of Mesa,* 212 Ariz. 446, 450, ¶ 4, 133 P.3d 756, 760 (App. 2006).

¶ 11 Doe alleged, and the superior court found, that the Policy violates a woman's Fourteenth Amendment right to choose to have an abortion, as articulated by the United States Supreme Court in *Roe v. Wade,* 410 U.S. 113, 153–54, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and reaffirmed by the Court in *Planned Parenthood v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The trial court also concluded that the Policy served no reasonable penological interest, citing the four-part test developed in *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The County contends these rulings were in error.

¶ 12 As an initial matter, we recognize that the County's Policy does not apply solely to abortion procedures, but prohibits the transportation of inmates off-site for any elective medical procedure. Doe challenges the Policy only insofar as it applies to inmates seeking a non-therapeutic abortion. The interests at stake, and the constitutional analysis of any rights associated with such interests, will necessarily depend on the specific elective procedure sought. An inmate will not be prejudiced by having to wait until after release to obtain most elective medical procedures, but the Supreme Court has recognized that involuntary delays in obtaining an abortion have constitutional significance because "time is likely to be of the essence in an abortion decision." *H.L. v. Matheson,* 450 U.S. 398, 412, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); *see also Ohio v. Akron Ctr. for Reprod. Health,* 497 U.S. 502, 513–14, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (recognizing that a statutory judicial bypass procedure must mandate an expeditious process "to allow ... an effective opportunity to obtain the abortion"). Accordingly, we limit our discussion of the Policy to its application to prohibit the transportation of inmates for elective abortion services.

## A. Undue Burden Test

¶ 13 The parties present divergent views of the standard we should apply to review the Policy. Doe argues we must apply the "undue burden" test articulated in *Casey.* The County maintains, however, that because the Policy is a prison regulation, even if we determine the Policy imposes an "undue burden," we must defer to the County's discretion if the Policy reasonably relates to a legitimate penological interest under *Turner.* The County contends the trial court erred by evaluating the Policy under both tests, and asserts that the trial court should have concluded that the Policy does not constitute an "undue burden" and ended its inquiry.[5] To determine which standard applies, we evaluate the nature of the right to choose to have an abortion and the extent to which jail officials may restrict inmates' constitutional rights.

¶ 14 Imprisonment does not automatically deprive a prisoner of his or her constitutional rights or claims. *Turner,* 482 U.S. at 84, 107 S.Ct. 2254. Nevertheless, imprisonment allows the government to impose greater restrictions on the exercise of constitutional rights than would otherwise be valid, and many constitutional rights enjoyed prior to incarceration are limited or lost upon im-

5. The County also argues that we must first apply the undue burden test, and only if we find that the Policy constitutes an undue burden on inmates' rights to choose to have an abortion may we then examine whether the Policy is valid under *Turner* as a regulation reasonably related to legitimate penological interests. Courts, however, have applied the tests set forth in *Casey* and *Turner* as alternative, not sequential measures. *See Roe v. Crawford,* 439 F.Supp.2d 942, 947–49 (W.D.Mo.2006), *appeal filed; Victoria W. v. Larpenter,* 369 F.3d 475 (5th Cir.2004). We agree with this approach.

prisonment. *See Beard v. Banks,* —— U.S. ——, 126 S.Ct. 2572, 2577–78, 165 L.Ed.2d 697 (2006) (stating the Constitution permits greater restriction of prisoners' rights). The United States Supreme Court ruled in *Turner* that a prison regulation that impinges on inmates' constitutional rights might nonetheless be valid if the regulation "is reasonably related to legitimate penological interests," and is not an "exaggerated response" to the regulation's objectives. 482 U.S. at 89–91, 107 S.Ct. 2254. The County urges us to apply this standard to evaluate the Policy.

¶ 15 Doe argues, however, that pursuant to the United States Supreme Court decision in *Johnson v. California,* 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005), the Policy is subject only to the standard of review applicable to restrictions on the right to choose to terminate a pregnancy outside the prison context, specifically, the "undue burden" test. In *Johnson,* the Court held that a prison regulation requiring segregation of inmates on the basis of race should be analyzed under the strict-scrutiny test otherwise applicable to policies based on racial classifications, not pursuant to the more deferential *Turner* reasonable-relationship test. *Id.* at 512, 125 S.Ct. 1141. The Court reasoned that it had applied *Turner's* reasonable-relationship test only to rights that are "inconsistent with proper incarceration," because those rights may be limited in the prison context, but that the logic of *Turner* did not apply to the segregation policy because the right to be free from racial discrimination "need not necessarily be compromised for the sake of proper prison administration." *Id.* at 510, 125 S.Ct. 1141 (quoting *Overton v. Bazzetta,* 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003)). Doe claims that a woman's right to choose to terminate her pregnancy, like the right to be free from racial discrimination, is not inconsistent with incarceration, bears no relationship to the goals of criminal deterrence or social isolation, and implicates no security concerns. Doe thus urges us to apply the undue burden test to evaluate the County's Policy.

¶ 16 We conclude that the undue burden test does not apply to the Policy at issue.

The Supreme Court's decision in *Johnson* did not overrule the numerous cases in which the Court has consistently held that incarceration limits many privileges and rights. *Id.* Indeed, the Court in *Johnson* expressly acknowledged many appropriate prison restrictions on constitutionally protected rights, including restrictions on freedom of association, limitations on inmate correspondence, restrictions on inmates' access to courts, restrictions on receipt of subscription publications, work rules limiting prisoners' attendance at religious services, the involuntary medication of mentally ill prisoners and restrictions on the right to marry. *Id.* We believe that Doe's claim challenging the County's restriction on a woman's right to terminate her pregnancy is not analogous to the equal protection challenge to a race-based prison regulation at issue in *Johnson.* As *Johnson* shows, distinctions based on race are inherently suspect, but the Supreme Court has recognized that the right to an abortion is not unlimited. Accordingly, we analyze Doe's Fourteenth Amendment claim by applying the four-part *Turner* test to determine whether the Policy is a valid regulation of inmates' rights. *Accord Roe,* 439 F.Supp.2d at 948 (declining to interpret *Johnson* to require the application of the *Casey* undue burden test, rather than the *Turner* reasonable relationship test, to a prison regulation prohibiting transportation of inmates for abortion care).

**B. *Turner* Analysis**

 ¶ 17 The United States Supreme Court held in *Turner* that several factors are relevant in determining whether a policy that restricts inmates' constitutional rights is valid as a regulation reasonably related to a legitimate penological interest. These factors, commonly known as the *Turner* test, are (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate, neutral governmental objective advanced as its justification; (2) whether the inmates have an alternative means of exercising the restricted right; (3) the impact of accommodation of the right on

prison resources; and (4) whether alternatives to the policy exist that would accommodate the inmates' rights at de minimis cost to penological interests. *Id.* at 89–91, 107 S.Ct. 2254 (citations omitted). The County contends that consideration of these factors weighs in favor of the Policy and argues that the trial court erred by failing to give appropriate deference to the expertise and judgment of the County's jail administrators.

¶ 18 We examine each factor in turn, affording "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton,* 539 U.S. at 132, 123 S.Ct. 2162 (holding regulation limiting prison visitation rights did not violate First Amendment's guarantee of free association). We are mindful, however, that in this case the County has effectively declined to exercise its professional judgment. The County has simply left to the courts the security and resource issues it asserts should control the decision whether it is necessary to transport an inmate. Because of this, our deference to the objectives presented by the County is confined to its decision to require a court order.

### 1. Whether the Policy Bears a Reasonable Relationship to Legitimate Penological Interests

¶ 19 The County advances several penological justifications for the Policy. Specifically, the safety/security of inmates and others, conservation of government resources, limitation of the County's liability exposure, and ensuring that prison officials do not violate Arizona law.

#### a. Safety and Security Concerns

¶ 20 Safety and security considerations properly underlie all County transportation regulations and policies, and constitute legitimate governmental interests. *See Overton,* 539 U.S. at 133, 123 S.Ct. 2162 (stating that promoting internal security is perhaps the most legitimate of all penological goals). The County claims that the Policy furthers its security concerns because it requires the superior court to examine the reasons advanced by the inmate for transportation and to determine whether the transportation is necessary. Doe argues that the evidence does not support the County's proffered security justification.

¶ 21 The County frequently transports inmates for court appearances, compassionate visits (visits with dying family members or for funeral services), and for non-emergency medical care that CHS deems necessary. The County performs many of these transports voluntarily, without a court order.

¶ 22 We find no evidence in the record that an increased risk of a security breach exists when the County transports an inmate for a non-therapeutic abortion compared to transportation for any other reason. Indeed, the County acknowledged that transporting inmates for abortion services is no more secure if done pursuant to court order, as the County now does, rather than voluntarily. Moreover, Frank Kelch, the former Captain and Division Commander for the County's Security and Transport Division, testified that he is aware of only four or five transports for non-therapeutic abortions since the County instituted the Policy approximately fifteen years ago.

■ ¶ 23 We recognize that the County may have a legitimate security interest in keeping the number of inmate transports to a minimum. *See, e.g., Victoria W.,* 369 F.3d at 486–87 (holding requirement that prisoners obtain court order for elective medical procedures, including abortion, was reasonably related to legitimate security concerns because it aimed to reduce the total number of offsite transports). Nevertheless, the County fails to present any evidence that the Policy in any way addresses its security concerns. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254.

¶ 24 The County did not object to transporting Doe on security grounds and apparently has never raised a security objection to transporting any inmate seeking an abortion. Given that the County, not the court, has expertise in security, we fail to see how requiring a court order furthers any legitimate security interest. In any event, the County can address any security concerns relating to a particular inmate as an administrative matter soon after the inmate first requests transportation. If, as in this case, the County has no security concerns, the transportation may proceed. If security issues exist, the County can inform the inmate, and solutions may possibly be fashioned. Therefore, we reject the County's claim that requiring a court order satisfies a legitimate penological interest in security.

### b. Conservation of County Resources[6]

¶ 25 The County asserts that the Policy is necessary for conservation of County resources. Doe argues that this argument is more properly addressed under the third *Turner* prong regarding whether accommodation will have a significant impact on prison staff. We agree that the County's interest in conservation of prison resources may directly affect the security, and other resources available to the jail facilities. We are mindful, however, that "where conditions within a prison facility are challenged as constitutionally inadequate, courts have been reluctant to consider costs to the institution a major factor in determining whether a constitutional violation exists." *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 336 (3rd Cir.1987).

¶ 26 The County maintains that the Policy is necessary to conserve County resources because it limits transports for non-medically necessary procedures and thereby "allows the [County] to focus on the mandated transportations, such as transporting inmates back and forth from court or to medical appointments that are medically necessary." The County admits that only five or six inmates have obtained a court order for transportation for abortion services since the County implemented the Policy in 1990. Compared to the number of transports the County performs for court appearances, compassionate visits, and what it deems necessary medical care, the demand for transportation for abortion services is de minimis. Moreover, the County presents no evidence that the cost for these transports significantly impacts the County's security or transportation costs, nor do we see how it could as the County requires that inmates transported for non-therapeutic abortion procedures reimburse the County for security and transportation costs.[7]

¶ 27 In addition, it is not clear that the Policy, as applied to transportation for abortion services, reduces these costs. As the County must comply with a court order directing it to transport an inmate for abortion services, *see Holt,* 197 Ariz. at 616, ¶ 11, 5 P.3d at 950, the Policy does not allow the County to wholly avoid the costs associated with transports for abortion services. Further, as Doe points out, if an inmate is unable to obtain an abortion, the County will expend resources fulfilling its responsibility to provide her proper pre-natal, delivery and post-natal medical care, a cost that may equal or exceed the cost associated with transportation for abortion services. *E.g., Monmouth,* 834 F.2d at 341 (stating that accommodation for abortion services imposes no greater burden on the government than already exists under its responsibility to provide proper

6. Doe urges us to decline to consider this argument because, she claims, the County did not raise it in the trial court. Although the County did not use the specific phrase "conservation of resources," it did discuss in its trial court pleadings that the Policy limiting transports for elective medical procedures allowed the County to concentrate on transporting inmates to court appearances and "necessary" medical appointments. Thus, the County sufficiently preserved this argument for appeal.

7. For inmates such as Doe, who are eligible for work furlough release, it is possible that security is unnecessary and the inmate could arrange her own transportation. This is the kind of detail the County is best equipped to address.

pre- and post-natal care to pregnant inmates).

¶ 28 Therefore, we find that the evidence does not establish a logical connection between the Policy and the County's objective of conserving its resources.

### c. Liability Concerns

¶ 29 The County next argues that the Policy reduces its liability exposure by limiting: (1) liability to third parties who object to the inmates' abortion; (2) liability to third parties for harm caused by an escaping or escaped inmate; and (3) liability to the inmate for health complications that arise before, during or after the abortion. In essence, the County suggests that its liability exposure is reduced if it "involuntarily" transports an inmate pursuant to a court order rather than voluntarily honoring the inmate's request for transportation.

¶ 30 The County's argument that the Policy limits the County's liability to third parties who may object to an inmate obtaining an abortion is unpersuasive. The County cites no such cause of action that might arise from its transportation of an inmate for an abortion procedure, and we know of no civil liability created by assisting a woman to obtain a legal abortion. Similarly, the County does not explain how it could be liable to an inmate for complications arising out of an abortion procedure performed by a third party medical practitioner selected and compensated by the inmate. These potential threats of vague or unknown liability are not sufficient to support the Policy.

¶ 31 The County's professed concerns regarding liability for the conduct of inmates during transportation are similarly unfounded, as Arizona law exempts public entities and their employees, in the absence of intentional conduct or gross negligence, from liability for injuries "caused by an escaping or escaped prisoner." A.R.S. § 12–820.02(A)(2) (2003); *see generally Clouse v. Arizona Dep't*

of Pub. Safety, 199 Ariz. 196, 16 P.3d 757 (2001). We note that this statute renders the circumstances in this case significantly different from those present in *Victoria W.*, where applicable Louisiana law exposed the prison to liability claims arising from the acts of escaped prisoners, a factor the court of appeals repeatedly cited as a justification for the regulation at issue. 369 F.3d at 486–87. Therefore, the County's Policy is not reasonably related to its proffered justification of reducing its liability exposure.

### d. Avoiding Violations of Arizona law

¶ 32 Finally, the County claims that the Policy advances its interest in ensuring that jail officials do not violate Arizona law. Specifically, the County cites A.R.S. § 35–196.02 (2000),[8] which states that public funds may not be "expended for payment to any person or entity for the performance of any abortion unless an abortion is necessary to save the life of the woman having the abortion."

¶ 33 The County expends no public funds for abortion procedures as it requires an inmate seeking to terminate her pregnancy to bear the cost of the abortion services as well as the related security and transportation costs. Moreover, if the County's concern were valid, it would be in violation of the statute even if a court ordered the transportation. The record shows, however, that the County has never opposed an inmate's request for a court order requiring it to transport the inmate for abortion services on the basis that the public funds statute prohibits the transportation of inmates for abortion services.

¶ 34 Thus, we find that the Policy is not reasonably related to the County's objective of avoiding violations of law.

### 2. Whether Inmates Have Alternative Means To Exercise Their Right

■ ¶ 35 The County argues that we should sustain the Policy because an alterna-

---

8. This statute was held to be unconstitutional as applied to a context and for reasons distinguish-

able from this case. *Simat Corp. v. Ariz. Health Care*, 203 Ariz. 454, 56 P.3d 28 (2002).

tive procedure allows inmates to exercise their right to choose to have an abortion; namely, an inmate may seek an order from the superior court directing the County to transport the inmate for an abortion procedure. Doe responds, however, that because an inmate is unable to obtain an abortion within the jail facilities, pregnant inmates have no alternative means to exercise their right to choose to terminate their pregnancies. To sustain the Policy, we need not find that inmates' alternatives are ideal; we need only determine that alternatives are available. *Overton*, 539 U.S. at 135, 123 S.Ct. 2162.

¶ 36 The County contends that the Policy is akin to the judicial bypass procedure specified in certain state laws that restrict a minor's ability to obtain an abortion without parental consent. Such laws have been held to be valid if a minor is permitted to petition a court to obtain authorization for an abortion in lieu of obtaining the requisite parental consent for the procedure. *See Bellotti v. Baird*, 443 U.S. 622, 643, 649, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *Casey*, 505 U.S. at 899, 112 S.Ct. 2791; *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789 (9th Cir.2002) (holding Arizona's judicial bypass provision adequately protected minors' right to choose).

¶ 37 Regulations affecting minors implicate different concerns, and may justifiably be broader, than those applicable to adult women. *See Casey*, 505 U.S. at 895, 898, 112 S.Ct. 2791 (stating that assumptions regarding the need for consultation that may be reasonably adopted with respect to minors cannot also be applied to adult women and invalidating statute requiring spousal notification before abortion procedure); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 69, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976)(holding that the United States Constitution does not permit a state to require a married woman to *obtain* her husband's consent before undergoing an abortion). We are therefore un-persuaded by the County's argument that refusing to transport inmates for an abortion procedure absent a court order is acceptable because a similar approach has been held valid when applied to minors.

¶ 38 Moreover, we are troubled by the absence of standards available to guide the superior court when it reviews an inmate's request for transportation. Although the County maintains that the court is not given a veto over an inmate's decision to terminate her pregnancy, it is evident that the court may in fact prevent an inmate from obtaining an abortion by delaying or denying her request, thereby functioning as a gate-keeper with the ability to overrule her choice to have an abortion.[9] The evidence is that the number of such requests is very low and that the County has never contested an inmate's application for such transportation. Requiring a court order in the first instance for all inmates who desire access to abortion services unnecessarily limits such access. While we recognize that the County might decline to transport an inmate who presents a particular security or liability concern, an indiscriminate ban on all transportation for non-therapeutic abortions does not allow inmates sufficient alternative means to exercise their right to choose to have an abortion.

### 3. Impact Accommodation Would Have On Prison Resources

¶ 39 The County argues that making an exception to the Policy for requests for abortion procedures would greatly impact prison resources because each time the County transports a prisoner, extra personnel and resources are required. We agree with Doe that the undisputed evidence demonstrates that accommodating inmates' abortion rights would have a de minimis financial impact on the County's jail facilities given that the inmate bears the expense.

¶ 40 As discussed, the County regularly transports inmates for court appearances,

---

9. Our conclusion is further supported by the deposition testimony of Sheriff Arpaio that the County will only transport an inmate for abor-tion services pursuant to a court order because it "feel[s] more comfortable" if a court has issued such an order.

compassionate visits and non-emergency, medically necessary treatment. Transportation for abortion services are a negligible fraction of the overall transportation the County performs each year, and there is no evidence that the costs associated with this transportation are significantly higher than other transportation. *See, e.g., Victoria W.,* 369 F.3d at 486–88 (holding regulation requiring inmates to obtain a court order to obtain abortion services served prison's proffered economic justification when prisoners had to be escorted to a facility located one hour away). In addition, the County requires inmates to pay for the costs of security and transportation.

¶ 41 We find no evidence that providing transportation for abortion services without a court order would significantly and adversely affect County resources.

### 4. Absence Of Ready Alternatives

¶ 42 Finally, although the County contends that there is no alternative to the Policy, we determine that there is an obvious, easy alternative that accommodates a woman's right to choose to have an abortion and imposes a de minimis burden on the pursuit of the County's stated objectives; namely, the County may consider inmates' requests for transportation for abortion services at the administrative level, just as it now considers requests for compassionate visits. Any security or resource issues may be raised and addressed administratively, without imposing a burdensome requirement that an inmate first obtain a court order.[10] The County claims expertise on security and resource issues. It should exercise that expertise. It should be the County that, in the first in-

stance, addresses an inmate's request for transportation.[11]

### CONCLUSION

¶ 43 After considering the *Turner* factors, we conclude that the Policy represents an "exaggerated response" to the County's proffered penological concerns and is invalid insofar as it applies to transportation for abortion services. 482 U.S. at 90–91, 107 S.Ct. 2254. The evidence demonstrates that the County can fully accommodate Doe's abortion rights at de minimis cost to the penological interests articulated by the County. The Policy is therefore not reasonably related to the County's professed neutral objectives and is invalid. For the foregoing reasons, we affirm the superior court's order.

CONCURRING: SUSAN A. EHRLICH, Judge and MARGARET H. DOWNIE, Judge.[12]

---

**10.** Indeed, as Doe points out, the Arizona State prison system and the Pima County jail system voluntarily transport inmates for abortion services.

**11.** The trial court's order enjoins the County "from directly or indirectly enforcing the unwritten policy described above or requiring a pregnant inmate in the Maricopa County jails to obtain a court order before she will be granted transportation to obtain an abortion." The superior court will plainly have the authority to en-

force this order if the County unreasonably, or without reasons, refuses a transportation request.

**12.** The Honorable Margaret H. Downie, Judge of the Maricopa County Superior Court, was authorized by the Chief Justice of the Arizona Supreme Court to participate in the disposition of this appeal pursuant to the Arizona Constitution, Article 6, Section 3, and A.R.S. § 12–145 to –147 (2003).